1    Lawrence Brewster
Regional Solicitor
2    Daniel J. Chasek
Associate Regional Solicitor
3    Susan Seletsky, Attorney
**Boris Orlov**, Attorney (CSBN 223532)
4    Grace Kim, Attorney
Office of the Solicitor (Sol# 0818279)
5    United States Department of Labor
350 S. Figueroa St., Suite 370
6    Los Angeles, California 90071-1202
      Telephone: (213) 894-5410
7       Facsimile: (213) 894-2064
8    orlov.boris@dol.gov

9    Attorneys for the Plaintiff

10

11          UNITED STATES DISTRICT COURT

12                FOR THE

13        CENTRAL DISTRICT OF CALIFORNIA

14    **HILDA L. SOLIS,**\*         )   Case No. SACV08-00998 CJC (MLGx)
      Secretary of Labor,         )
15       United States Department of Labor,  )
                              )   **PLAINTIFF'S CLOSING BRIEF**
16             Plaintiff,         )
                              )
17             v.           )   **The Honorable Cormac J. Carney**
                              )
18    **BEST MIRACLE CORPORATION,**  )
      A California corporation et al.,    )
19                               )   Trial: February 16, 2010 – February
20           Defendants.        )   25, 2010
                              )
21                               )

22                               )

23                               )

24    \* Pursuant to Rule 25(d)(1) of the Federal Rules of
Civil Procedure, the caption of this action has been
25    amended to reflect the appointment of Secretary Solis.

26

27

28

**PLAINTIFF'S CLOSING BRIEF**                                  i

## Table of Contents

I.  INTRODUCTION ...........................................................................1

II.  BACKGROUND.............................................................................1

III.  LEGAL STANDARD.......................................................................2

IV.  EMPLOYEES OF BEST MIRACLE ARE COVERED BY THE FLSA...........3

V.  DEFENDANTS VIOLATED THE FLSA'S RECORDKEEPING
REQUIREMENTS..........................................................................3

VI.  DEFENDANTS FAILED TO PAY EMPLOYEES AN OVERTIME RATE FOR
ALL HOURS WORKED OVER 40 HOURS IN A WORKWEEK.................8

VII.  DEFENDANTS FAILED TO PAY THE MINIMUM WAGE REQUIRED BY
THE FLSA.................................................................................13

VIII.  REPRESENTATIVE SAMPLE..........................................................13

IX.  BACKWAGE COMPUTATIONS.......................................................14

X.  DEFENDANTS BEST MIRACLE, THUY THI LE, AND TOAN VAN
NGUYEN ARE "EMPLOYERS" WITHIN THE MEANING OF THE
FLSA......................................................................................18

XI.  DEFENDANTS' VIOLATIONS WERE "WILLFUL," TRIGGERING A THREE
YEAR STATUTE OF LIMITATIONS..................................................20

XII.  DEFENDANTS VIOLATED THE "HOT GOODS" PROVISION OF THE
FLSA .....................................................................................22

XIII.  DEFENDANTS FAILED TO MEET THEIR BURDEN...........................24

A. Defendants' Employee Witnesses are Not Credible...........................24

B. Defendants Le and Nguyen are Not Credible..................................26

XIV.  PREJUDGMENT INTEREST.............................................................29

XV.  INJUNCTION..............................................................................29

XVI.  CONCLUSION.............................................................................30

1

## Table of Authorities

2

3 **Federal Cases**

4 Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515

5 (1946) ……………………………………….......................................... *passim*

6 Citicorp Industrial Credit v. Brock, 483 U.S. 27, 107 S.Ct. 2694, 97 L.Ed.2d 23 (1987)

7 ………………………………………………………………………………..23

8 Maryland v. Wirtz, 392 U.S. 183, 88 S. Ct. 2017, 20 L.Ed.2d 1020 (1968)

9 …………………………………………………………………….....................3

10 McLaughlin v. Richland Shoe Co., 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115

11 (1988) …………………………………………………………….14, 20

12 Nat'l League of Cities v. Usery, 426 U.S. 833, 96 S.Ct 2465, 49 L.Ed 2d 245 (1976)

13 ………………………………………………………………………………..3

14 United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301 (1945)

15 ………………………………………………………………………………..18

16 Biggs v. Wilson, 1 F.3d 1537 (9th Cir. 1993) ………………………………..29

17 Brennan v. Gen. Motors Acceptance Corp., 482 F.2d 825 (5th Cir. 1973)

18 ………………………………………………………………………….....................13

19 Brock v. Big Bear Market No. 3, 825 F.2d 1381 (9th Cir. 1987) …………………….30

20 Carter v. Panama Canal Co., 463 F.2d 1289 (D.C. Cir. 1972) …………………….2

21 Caserta v. Home Lines Agency, Inc., 273 F.2d 943 (2d Cir. 1959) ………………….4

22 Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962 (6th Cir. 1991) …………………….20

23 Donovan v. Bel-Loc Diner, Inc., 780 F.2d 1113 (4th Cir. 1985) …………………14

24 Donovan v. Hamm's Drive Inn, 661 F.2d 316 (5th Cir. 1981) …………………………19

25 Donovan v. New Floridian Hotel, Inc., 676 F.2d 468 (11th Cir. 1982)

26 ………………………………………………………………………………….13

27 Donovan v. Sovereign Security, Ltd., 726 F.2d 55 (2d Cir. 1984) …………………….29

28 Donovan v. Sureway Cleaners, 656 F.2d 1368 (9th Cir. 1981)……………...............30

E.E.O.C. v. County of Erie, 751 F.2d 79 (2d Cir. 1984) ……………………………29

Ford v. Alfaro, 785 F.2d 835 (9th Cir. 1986) ……………………………...............29

Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320 (9th Cir. 1991) ……..................18

Hodgson v. Humphries, 454 F.2d 1279 (10th Cir. 1972) ………………………….2

Lambert v. Ackerley, 180 F.3d 997 (9th Cir. 1999) ……………………...............18

Marshall v. Chala Enters. Inc., 645 F.2d 799 (9th Cir. 1981) …………………….30

Martin v. Deiriggi, 985 F.2d 129 (4th Cir. 1992) ………………………………….20

McLaughlin v. Ho Fat Seto, 850 F.2d 586 (9th Cir. 1988) ………………....*passim*

Wirtz v. Dix Box Co., 322 F.2d 499 (9th Cir. 1963) ……………………………….9

Wirtz v. McClure, 333 F.2d 45 (10th Cir. 1964) ……………………...…………….2

Wirtz v. Mississippi Publishers Corporation, 364 F.2d 603 (5th Cir. 1966)………....4

Dole v. Bishop, 740 F. Supp. 1221 (S.D. Miss. 1990) …………………………24

Donovan v. Kaszycki & Sons Contractors, Inc., 599 F. Supp. 860 (S.D.N.Y. 1984)
………………………………………………………………………………4

Herman v. Fashion Headquarters, Inc., 992 F. Supp. 677 (S.D.N.Y. 1998)
……………………………………………………………………………23

Martin v. Deiriggi, 1991 WL 323416 (N.D.W.Va. Dec. 12. 1991) ……………….13, 24

McLaughlin v. DialAmerica Marketing, Inc., 716 F. Supp. 812 (D.N.J. 1989)
………………………………………………………………………………14

Russo v. Unger, 845 F. Supp. 124 (S.D.N.Y. 1994) …………………...............29

**Federal Statutes**

26 U.S.C. § 6621…………………………………………………………29

28 U.S.C. § 1961 ………………………………………………………29

29 U.S.C. § 203………………………………………………………...…3

29 U.S.C. § 206………………………………………………1, 13, 20

29 U.S.C. § 207………………………………………………………1, 8

29 U.S.C. § 211…………………………………………………………1

**PLAINTIFF'S CLOSING BRIEF**

29 U.S.C. § 215.................................................................*passim*

29 U.S.C. § 217...........................................................2, 29, 30

29 U.S.C. § 255.....................................................................20

29 C.F.R. § 516 ...................................................................3, 4

29 C.F.R. § 778.5 ...................................................................15

29 C.F.R. § 778.111 ...............................................................15

**Federal Rules**

FED. R. EVID. 801(d)(2)(B) ...............................................22, 25

**PLAINTIFF'S CLOSING BRIEF**

## I. INTRODUCTION

Best Miracle employees were garment workers who worked over 60 hours per week but were not paid the overtime required by law. During trial, the Secretary of Labor established that throughout the period of September 5, 2005 through August 12, 2007 ("subject period"), Defendants violated the Fair Labor Standards Act of 1938's ("FLSA" or the "Act") minimum wage (29 U.S.C. § 206), overtime (29 U.S.C. § 207), recordkeeping (29 U.S.C. § 211) and "hot goods" provisions (29 U.S.C. § 215).  The evidence showed that employees worked, on average, from 59 to 78 hours per week but were not paid an overtime rate for the hours worked over 40.  Defendants concealed the substantial overtime worked by paying their employees in cash, at a straight time rate, for the hours they worked over 40, and failing to record those hours and cash payments on their records.  Defendants' careful and deliberate falsification of records demonstrates not only their knowledge of the Act's requirements, but the willful nature of these FLSA violations.  Because the garments that were worked on by Best Miracle employees who were paid substandard wages were shipped in interstate commerce, Defendants violated the hot goods provision of the Act.

Defendants' deliberate and repeated violations of the FLSA harmed not just their employees, who were denied the legal wages to which they were entitled, but also gave Defendants an unfair competitive advantage over those employers who paid the wages required by the Act.  To remedy these violations, the Court must find that Defendants violated the FLSA's wage, recordkeeping, and hot goods provisions, and issue an injunction forbidding such future violations and the continued withholding of the back-wages due employees, an amount which totals $176,237.50, plus prejudgment interest.

## II. BACKGROUND

Plaintiff Hilda L. Solis, the Secretary of Labor, U.S. Department of Labor ("Secretary"), filed this action on September 5, 2008. The First Amended Complaint, filed on December 23, 2009, sought to enjoin Best Miracle Corporation, a California corporation ("Best Miracle"), Thuy Thi Le and Toan Van Nguyen, individually and as managing

**PLAINTIFF'S CLOSING BRIEF**                                                                                    1

1  agents of the corporate Defendant (collectively, "Defendants"), from violating the provi-

2  sions of Sections 15(a)(2) and 15(a)(5) of the FLSA, 29 U.S.C. § 215(a)(2) and

3  § 215(a)(5), and from continuing to withhold payment of unpaid minimum wages and

4  overtime due Defendants' employees, plus pre-judgment interest. This action was

5  brought under FLSA Section 17, 29 U.S.C. § 217, which provides for injunctive relief in

6  actions brought by the Secretary.

7  ## III.  LEGAL STANDARD

8       To establish a violation of the FLSA, the Secretary need only prove that the em-

9  ployer's records are not accurate, and that employees performed work for which they

10  were not properly compensated, as a matter of "just and reasonable inference." <u>Anderson</u>

11  <u>v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-688, 66 S.Ct. 1187, 90 L. Ed. 1515

12  (1946), <u>superseded by statute on other grounds as stated in</u> <u>Carter v. Panama Canal Co.</u>,

13  463 F.2d 1289, 1293 (D.C. Cir. 1972).  Once established, the burden then shifts to the

14  employer to come forward with evidence to establish the precise amount of work per-

15  formed or negate the reasonableness of the inference to be drawn from the employees'

16  evidence. <u>Id.</u>; <u>McLaughlin v. Ho Fat Seto</u>, 850 F.2d 586, 589 (9th Cir. 1988).  The

17  Ninth Circuit has held that this standard "allows district courts to award back wages un-

18  der the FLSA to non-testifying employees based upon the fairly representative testimony

19  of other employees . . . . The burden is not on the employees to prove the precise extent

20  of uncompensated work." <u>Id.</u>

21       Once the Secretary has made a showing of inaccurate payroll records, as she has

22  done in the instant matter, "[t]he testimony of former employees standing alone, [makes]

23  out the Secretary's prima facie case." <u>Hodgson v. Humphries</u>, 454 F.2d 1279, 1283 (10th

24  Cir. 1972) (citing <u>Wirtz v. McClure</u>, 333 F.2d 45, 47 (10th Cir. 1964)).  Therefore, the

25  Secretary makes out her prima facie case by showing that Defendants' time and payroll

26  records are inaccurate and presenting employee testimony supporting overtime and mini-

27  mum wage violations.

28  //

**PLAINTIFF'S CLOSING BRIEF**                                                          2

**IV.  EMPLOYEES OF BEST MIRACLE ARE COVERED BY THE FLSA**

Defendants are subject to the requirements of the FLSA.  Defendants have stipu-
lated that they are an enterprise engaged in commerce or in the production of goods for
commerce as defined in 29 U.S.C. § 203(s)(1).  <u>See</u> Trial Exhibit ("Exh.") 175, Admitted
Fact 10.  Since enterprise coverage is established, all employees of the enterprise are
covered by the FLSA's protections.  <u>Maryland v. Wirtz</u>, 392 U.S. 183, 188, 88 S. Ct.
2017 (1968), <u>overruled on other grounds as stated in</u> <u>Nat'l League of Cities v. Usery</u>,
426 U.S. 833, 96 S.Ct 2465, 49 L.Ed 2d 245 (1976).

The Secretary seeks to recover backwages for the Best Miracle employees listed
on Exh. 1 to the First Amended Complaint. (Exh. 175, Admitted Fact 1).  The minimum
employment period for each employee is stipulated by the parties. (Exh. 175, Admitted
Fact 20). The corporate Defendant and Thuy Thi Le admit they were employers of the
employees identified in Exh. 1 to the First Amended Complaint, with the exception of
Kim Anh, Rosalia Linares, Alvaro Munoz, and Heidi Orosio. (Exh. 175, Admitted Fact
12). However, the Secretary presented evidence at trial that these four individuals were
indeed employees of Best Miracle. (<u>See</u> Sec. V(H) <u>infra</u>).

**V.  DEFENDANTS VIOLATED THE FLSA'S RECORDKEEPING REQUIRE-
MENTS**

During the subject period, Defendants violated Sections 11(c) and 15(a)(5) of the
FLSA, 29 U.S.C. § 211(c) and § 215(a)(5), because they failed to maintain accurate re-
cords of employee data, earnings, hours worked, and deliberately falsified time and pay-
roll records.

Section 11(c) of the Act, 29 U.S.C. §211(c), requires that an employer "shall
make, keep, and preserve such records of the persons employed by him and of the
wages, hours, and other conditions and practices of employment maintained by him[.]"
Section 15(a)(5) of the Act, 29 U.S.C. §215(a)(5), makes it unlawful to violate Section
11(c).  The Secretary's implementing regulations, found at 29 C.F.R. § 516, require, *in-
ter alia*, that employers preserve true and accurate records of the: (1) total daily and

**PLAINTIFF'S CLOSING BRIEF**                                                                3

weekly hours employees work; (2) employees' regular hourly rates of pay for each week that overtime is worked; (3) total daily or weekly straight time earnings, and (4) total weekly premium pay for overtime hours. 29 C.F.R. §516.2. § 516.5. <u>Donovan v. Kaszycki & Sons Contractors, Inc.</u>, 599 F. Supp. 860, 870 (S.D.N.Y. 1984) (collecting cases).

The Act's recordkeeping requirements "are the fundamental underpinnings of the Act, for only by relying on employers' records can the Secretary of Labor, with [her] limited facilities, hope to be able to enforce the substantive provisions. Failure to keep accurate records can obscure a multitude of minimum wage and overtime violations." <u>Wirtz v. Mississippi Publishers Corp.</u>, 364 F.2d 603, 607 (5th Cir. 1966). The Act requires an employer "'at its peril. . . to keep track of the amount of [hours] worked by its. . . employees[.]'" <u>Caserta v. Home Lines Agency, Inc.</u>, 273 F.2d 943, 946 (2d Cir. 1959). The obligation is the employer's and it is absolute. <u>See id.</u>

Here, Defendants violated the Act's recordkeeping requirements by failing to maintain complete and accurate records of the hours worked by, and the wages paid to, their employees. The Secretary presented the following evidence of record violations:

(A) **Timecards are not accurate:** Nine former Best Miracle employees testified that the timecards maintained by Defendants were not accurate because they did not reflect all hours worked by employees. Tr. Baez[1], (2/16/10), 63:9-65:13; Resendiz, (2/16/10), 147:18-148:12; Matias, (2/17/10), 8:24-9:12; Benitez, (2/17/10), 56:18-58:4; Rios, (2/17/10), 80:3-81:8; Alvarez, (2/17/10), 120:6-122:10; Montoya, (2/18/10), 6:3-17; Rangel, (2/18/10), 76:25-77:4; Fuentes, (2/18/10), 84:3-85:8.

(B) **Fraudulent timecards only show 30-40 hours worked:** Defendants' time and payroll records falsely show employees working between 30-40 hours per week when, in fact, they worked approximately 60 hours each week. Timecards, Exhs. 2, 6, 17, 20, 24, 26, 35, 36, 37; Tr. Baez, (2/16/10), 63:9-65:13; Resendiz, (2/16/10), 147:18-

---

[1] Citations to the trial transcript ("Tr.") will be cited by witnesses' last name, date of testimony, and transcript reference.

**PLAINTIFF'S CLOSING BRIEF**                                                                 4

148:12; Matias, (2/17/10), 8:24-9:12; Benitez, (2/17/10), 56:18-58:4; Rios, (2/17/10), 80:3-81:8; Alvarez, (2/17/10), 120:6-122:10; Montoya, (2/18/10), 6:3-17; Rangel, (2/18/10), 76:25-77:4; Fuentes, (2/18/10), 84:3-85:8.

(C) **Payroll records do not reflect the cash pay received by employees for hours worked but not reflected on the timecards:** There is abundant testimony that employees were paid in cash for hours worked, which were not reflected on the fraudu-lent timecards and paystubs. Baez, (2/16/10), 64:15-65:13; 67:5-10; Benitez, (2/17/10), 57:12-19; Resendiz, (2/16/10), 148:8-12; 149:1-10; Matias, (2/17/10), 11:23-12:7; Rios, (2/17/10), 79:9-21; Alvarez, (2/17/10), 121:23-122:10; Montoya, (2/18/10), 7:18-20, 15:13-23, 26:5-9; Rangel, (2/18/10), 76:24-77:4, 78:22-79:3; Fuentes, (2/18/10), 86:15-25, 93:12-21. The cash payments were not reflected on the payroll records and cash re-ceipts were not provided by Defendants. Leung, (2/23/10) 59:23-24, 62:16-21, 64:5-25.

(D) **Payroll records do not reflect the workweeks during which employees were paid only in cash:** Best Miracle employees testified that in some weeks they were paid only in cash. Tr. Baez, (2/16/10), 67:5-10 Resendiz, (2/16/10), 149:1-3; Montoya, (2/18/10), 26:5-9 Rangel, (2/18/10), 78:25-79:3. (See also Sec. V(I)). Moreover, time-cards that do not appear on the payroll records are identified in Exhs. 172 and 173.

(E) **Surveillance by DOL revealed 40-50 discrepancies with timecards**: The surveillance of the Best Miracle shop performed by DOL Investigator John Leung re-vealed 40-50 instances where cars registered to employees were parked at the shop on days where the timecards did not show that employee as having punched in, or long be-fore or after the employee was shown as having punched in or out for the day. Exhs. 121, 122, 123, 124. Leung, (2/19/10 Vol. I) 80:19-24.

(F) **Onsite investigation revealed employees working off the clock:** Investiga-tors John Leung and Tony Pham performed a head count during a July 30, 2007 onsite investigation of Best Miracle. They observed 31 employees at their work stations, six in the lunch room and 10 outside the shop. Tr., (2/16/10), 18:20-19:18, (2/19/10 Vol. I) 85:9-21, Exh. 125-1 and 125-2. However, Defendants' timecards reflected only 15 em-

**PLAINTIFF'S CLOSING BRIEF**                                                                 5

ployees working on that day.  Pham, (2/16/10) 22:7-22; Leung, (2/19/10, Vol. I) 86:17-25 (Exh. 125-2).  Defendant Le did not have an answer when Investigator Pham asked her where the rest of the punched-in timecards were.  Pham, (2/16/10) 26:21-27:12. Tellingly, Defendants never produced the timecards for the workweek that included July 30, 2007.  Leung, (2/19/10 Vol. II) 5:11-6:13.

(G) **Payroll records do not show the 62.7 hours worked by Carina Rangel during the workweek of 8/29/05-9/4/05:** Carina Rangel testified that she worked and was paid in cash for the timecard for workweek 8/29/2005 – 9/4/2005, pay date 9/9/2005, (2/18/10) 78:22-79:10, Exh. 35-4. Id.  This timecard shows her working 62.7 hours for the week. Exh. 35-4. Defendant Le testified that the Employee Time or Wage Sheet shows that Ms. Rangel did not work during that week. Tr., (2/25/10) 38:3-22. Payroll records do not show a check for Ms. Rangel for that week. (Exhs. 172 and 173-1 - 173-11). This timecard corroborates Ms. Rangel's testimony regarding her work schedule of 6:00 a.m. to 6:00 p.m. Monday through Friday and 6:00 a.m. to 2:00 p.m. on Saturday. The lack of payment for this workweek shown on the payroll records corroborates her testimony that she was paid in cash for this week.

(H) **Four Best Miracle employees do not appear on payroll records:**  Employees Kim Anh, Rosalia Linares, Alvaro Munoz, and Heidi Orosio do not appear on the Payroll Register or in the W-2s for Best Miracle. Tr., (2/19/10 Vol. I) 88:4-89:21, 95:19-96:10, (2/19/10 Vol. II), 4:11-5:9, Exhs., 98, 99, 100, 112, 113, 114.  However, testimony from other Best Miracle employees identified these four individuals as Best Miracle employees: Baez, (2/16/10), 83:11-25 (Anh); see also Exh. 125-1 entry number 8 showing that a timecard for K. Anh was present when Investigator Pham transcribed the timecards.  Baez, (2/16/10), 84:1-4 (Linares); Resendiz, (2/16/10), 151:19-22 (Linares); Montoya, (2/18/10), 17:8-16 (Linares); see also Exh. 125-1 entry number 6 showing that a timecard for Rosalba [sic] Linares was present when Investigator Pham transcribed the timecards. Resendiz, (2/16/10), 151:23-152:3 (Orosio (Osorio)).  Resendiz, (2/16/10), 151:9-14 (Munoz); Montoya, (2/18/10), 17:20-24 (Munoz).

**PLAINTIFF'S CLOSING BRIEF**                                                                          6

**(I) Payroll Records are not accurate because they do not show all the work-weeks worked by the employees:** Even the testimony of employee witnesses <u>called by Defendants</u> showed that the payroll records submitted by Defendants are not accurate:

Maria Rodriguez testified that she did not take any entire workweeks off during her five to six month employment with Best Miracle, and worked at least one day in every week. Tr., (2/23/10), 147:11-22.  However, the payroll summary shows that she did not appear on the payroll for three complete workweeks: 1/29/07-2/4/07, 5/28/07-6/3/07, and 7/2/07-7/8/07.  Exh. 88-2 - 88-3.

Maria Carmen Diaz testified that she did not take any entire workweeks off during the six to seven months she worked at Best Miracle.  Tr., (2/23/10), 157:12-20.  However, the payroll summary shows that she did not appear on the payroll for five complete workweeks: 1/29/07-2/4/07, 2/5/07-2/11/07, 5/28/07-6/3/07, 6/25/07-7/1/07, 7/30/07-8/5/07.  Exh. 63-2 - 63-3.

Jaime De La Rosa testified that although he would take off five days each year and he would take off days at a time, he would never take whole weeks off.  Tr., (2/24/10) 25:14-26:18.  Contrary to this testimony, the payroll summary shows that he did not appear on the payroll for eight full workweeks: 8/22/05-8/28/05, 6/5/06-6/11/06, 7/3/06-7/9/06, 9/11/06–9/17/06, 9/18/06–9/24/06, 10/16/06–10/22/06, 10/23/06–10/29/06, 6/25/07-7/1/07. (Exh. 61).

Lilia Avila testified that the longest amount of time she did not work was one week and that she never took off two or three weeks at one time.  Tr., (2/24/10), 45:12-20.  However, the payroll register shows that Ms. Avila did not appear on the payroll register for 18 weeks in 2006-2007, including twice for two weeks at a time and twice for three weeks at a time. Exhs. 99 and 100.[2]

---

[2] Specifically Ms. Avila does not appear on the payroll register for the following workweeks: 7/17/06-7/23/06, Exh. 99-221-226, 7/31/06-8/6/06, Exh. 99-233-239, 8/28/06-9/3/06, Exh. 99-260-265, 9/25/06-10/1/06, Exh. 99-278-282, 10/16/06-10/22/06, Exh. 99-292-294, 10/23/06-10/29/06, Exh. 99-296-298, 11/20/06-11/26/06, Exh. 99-

**PLAINTIFF'S CLOSING BRIEF**                                                                 7

Antonia Gonzalez Mendoza testified that she worked every workweek other than a six-month vacation in 2006 and another week off. Tr. (2/24/10) 63:18-64:8. However, the payroll register shows that Ms. Gonzalez Mendoza did not appear on the payroll register for 14 weeks, not including the six month 2006 vacation. Exhs. 98, 99 & 100.[3]

As shown above, Defendants' time and payroll records are not accurate. They cannot be relied on to show the hours worked, wages, paid or weeks of employment. As a result, Defendants cannot satisfy their burden pursuant to Mt. Clemens Pottery.

## VI. DEFENDANTS FAILED TO PAY EMPLOYEES AN OVERTIME RATE FOR ALL HOURS WORKED OVER 40 HOURS IN A WORKWEEK

Employees called by the Secretary testified that they consistently worked well in excess of forty (40) hours per week and were not paid overtime for hours worked over 40 as required by the FLSA. Defendants violated the provisions of Sections 7 and 15(a)(2) of the FLSA, 29 U.S.C. § 207 and § 215(a)(2), by employing individuals for workweeks longer than 40 hours without compensating them for hours worked in excess of 40 at rates not less than one and one-half times the regular rates at which they were employed. 29 U.S.C. § 207(a).

In view of the remedial purpose of the FLSA and the employer's statutory obligation to keep accurate and complete payroll and hours records, the employee's burden is

---

313-317, 12/4/06-12/10/06, Exh. 99-324 -330, 12/11/06-12/17/06, Exh. 99-330-336, 1/15/07-1/21/07, Exh. 100-11-16, 1/29/07-2/4/07, Exh. 100-24-28, 2/5/07-2/11/07, Exh. 100-28-34, 2/12/07-2/18/07, Exh. 100-34-40, 3/19/07-3/25/07, Exh. 100-69-76, 3/26/07-4/1/07, Exh. 100-78-84, 4/2/07-4/8/07, Exh. 100-84-90, 7/2/07-7/8/07, Exh. 100-192 -200, 7/16/07-7/22/07, Exh. 100-207-215.

[3] Specifically, Ms. Gonzalez Mendoza does not appear on the payroll register for the following workweeks: 9/19/05-9/25/05, Exh. 98-31-39, 9/26/05-10/2/05, Exh. 98-41-48, 10/3/05-10/9/05, Exh. 98-48-57, 11/28/05-12/4/05, Exh. 98-119-125, 12/5/05-12/11/05, Exh. 98-125-132, 12/26/05-1/1/06, Exh. 99-1-7, 1/2/06-1/8/06, Exh. 99-7-13, 3/20/06-3/26/06, Exh. 99-74-81, 3/27/06- 4/2/06, Exh. 99-106-112, 1/22/07-1/28/07,

**PLAINTIFF'S CLOSING BRIEF**                                                                 8

not to be an impossible hurdle.  As the Supreme Court held in Mt. Clemens Pottery Co.:

> Where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes ... the solution ... is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records. . .; it would allow the employer to keep the benefits of an employee's labor without paying due compensation. . . In such a situation, we hold that an employee has carried out his burden if he proves that he has, in fact, performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.

328 U.S. at 687.

The testimony of the employees, summarized below, shows a consistent pattern of hours worked and pay received.  Under Mt. Clemens, this proof is sufficient to show the amount and extent of that work as a matter of just and reasonable inference and establishes that employees performed work for which they were improperly compensated.  To require otherwise would enforce the type of penalty that Mt. Clemens holds is impermissible: rewarding an employer's failure to keep proper records and allowing the employer to keep the benefits of an employee's labor without paying due compensation.  Wirtz v. Dix Box Co., 322 F.2d 499, 501-02 (9th Cir. 1963). The Ninth Circuit held that the testimony of employee witnesses establishes as a matter of just and reasonable inference that all of the employees worked overtime even where that testimony is not consistent in terms of the exact days and hours worked.  McLaughlin v. Ho Fat Seto, 850 F.2d 586, 589 (9th Cir. 1988).

The overtime violation is supported by the evidence of the recordkeeping violation as set forth above, and the following evidence that show the amount and extent of work performed as a matter of just and reasonable inference:

---

Exh. 100-19-24, 3/19/07-3/25/07, Exh. 100-69-76, 3/26/07- 4/1/07, Exh. 100-78- 84,

**PLAINTIFF'S CLOSING BRIEF**

9

1    (A) **Employees worked 59 to 78 hours a week:** The general work pattern estab-

2    lished by the Secretary's evidence is 6:00 a.m. to 6:00 p.m., Monday through Friday,

3    from 6:00 a.m. to 12:00 p.m. or later on Saturdays, and some Sundays.  Eight of the nine

4    employees called by the Secretary testified that their Monday through Friday schedule

5    was 6:00 a.m. to 6:00 p.m.  One employee testified that his Monday through Friday

6    schedule was e worked 7:00 a.m. to 6:00 p.m.  The average hours worked by these nine

7    employees range from 59 to 78 hours per week.[4]

8    _____

9    4/2/07-4/8/07, Exh. 100-84-90, 6/11/07- 6/17/07, Exh. 100-171-180.

10   [4] **Lilia Baez: 71-78 hours per week:** Mondays through Fridays, 6 a.m. to 6 p.m. Tr.,
     (2/16/10) 56:6-7.  Saturdays, 6 a.m. to between 2 and 6 p.m. Id. at 56:8-23. Sundays, 6

11   a.m. to between 12 and 3p.m. Id. at 58:2-6. Worked three Sundays per month. Id. 57:19-

12   20. **David Resendiz: 64 hours per week plus occasional Sundays:** Mondays through
     Fridays, 6 a.m. to 6 p.m.  Tr., (2/16/10) 146:1-5; Saturdays, 6 a.m. to 1 p.m. Id. at

13   146:10-11. Worked "every Saturday." Id. at 146:9. Sundays, 6 a.m. to 1 p.m. Id. at

14   146:16-17.  Worked three Sundays a year. Id. at 146:15.  **Manuel Matias: 70 – 73
     hours per week, 60 hours per week for 5-6 months:** Mondays through Fridays, 6 a.m.

15   to 6 p.m.  Tr., (2/17/10) 6:12-18; for 5-6 months before he left Best Miracle, he would

16   start at 8 or 8:30 a.m. Id. at 7:9-14. Saturdays, 6 or 7 a.m. to 4 or 5 p.m. Id. at 6:19-22.

17   Sundays, 8 a.m. to between 12 and 1 p.m.  Id. at 8:14-16. Worked "most" Sundays. Id. at
     6:23-7:3. **Victor Juarez Benitez:  63.5 hours per week plus some Sundays:** Mondays

18   through Fridays, 6 a.m. to 6 p.m.  Tr.,(2/17/10) 55:5-10; Saturdays, 6 a.m. to 12 p.m. or

19   a little bit later. Id. at 55:11-15. Worked most Saturdays.  Id. at 55:16-18; Sundays, 6

20   a.m. to 10 or 11 a.m. Id. at 56:1-3. Worked 5 or 6 Sundays total during his employment.
     Id. at 55:21-25.  **Jorge Luis Rios: 63.5 – 69.5 hours per week:** Mondays through Fri-

21   days, 6 a.m. to 6 p.m.  Tr., (2/17/10) 78:13-15. Saturdays, 6 a.m. to 12 p.m. Id. at 78:18-

22   19. Worked "every" Saturday. Id. at 78:20-23.  Sundays, 6 a.m. to 12 p.m. Id. at 79:3-4.
     Worked about 20-30 Sundays per year.  Id. at 78:24-79:2. **Pablo Alvarez: 66 hours per**

23   **week 56 hours after the first 3 months:** Mondays through Fridays, 6 a.m. to 6 p.m.

24   Tr., (2/17/10) 119:6-11. The 6 a.m. to 6 p.m. was for three months.  Id. at 124:7. After-
     ward, Alvarez's schedule was from 7 a.m. to 5:30 p.m.  Id. at 124:8-9. Saturdays, 6 a.m.

25   to 3 p.m. Id. at 119:12-19. Worked every Saturday.  Id. at 119:16-17.  Did not work

26   Sundays.  Id. at 119:20-21.  **Juan Carlos Montoya: 64.5 – 66 hours per week; ap-**
     **proximately 50 hours per week in 2007:** Mondays through Fridays, 6 a.m. to 6 p.m..

27   Tr., (2/18/10) 4:25-5:2.  Saturdays, 6 a.m. to 1:30 or 3 p.m. Id. at 5:6-7.  Usually worked

28   every Saturday.  Id. at 5:8-11.  Maybe 3-4 Saturdays per year not worked.  Id. at 5:12-14.

**PLAINTIFF'S CLOSING BRIEF**                                                    10

(B) **All Best Miracle employees worked similar hours:** Best Miracle employees testified that other Best Miracle employees worked similar overtime hours. Tr: Baez, (2/16/10), 80:18-83:10; Resendiz, (2/16/10), 152:13-153:9; Alvarez, (2/17/10), 124:18-125:15; Montoya, (2/18/10), 73:5-15; Fuentes, (2/18/10), 82:3-16.  Moreover, David Resendiz testified that his wife, Leticia Damason, also worked at Best Miracle, carpooled to work with him, and worked the same hours Tr., (2/16/10) 150:14-23. Pablo Alvarez testified that his sister, Claudia Alvarez, also worked at Best Miracle and worked the same hours.  Tr., (2/17/10) 124:12-17.

(C) **Best Miracle was open for more than 60 hours a week:** Defendants admitted that Best Miracle was open 6:00 a.m. to 6:00 p.m., Monday through Friday, and then from 6:00 a.m. to 12:00 p.m. or later on Saturdays. Exh. 175 (Admitted Fact) No. 11.  Le Tr., (2/24/10) 89:3-19.

(D) **No overtime premium for piece rate employees:** Piece rate employees were paid the same piece rate for all hours worked, including hours worked in excess of 40 hours in a workweek. Resendiz (2/16/10), 151:1-2; Matias (2/17/10), 14:19-15:3; Alvarez (2/17/10) 122:16-124:1; Montoya (2/18/10), 13:17-24; Fuentes (2/18/10), 85:14-20.

(E) **No overtime premium for hourly employees:** Hourly employees were paid a straight hourly rate for all hours worked, including hours worked in excess of 40 hours in a workweek. Tr.: Baez, (2/16/10), 68:19-24; Benitez, (2/17/10), 58:13-14.

(F) **Piece rate tickets support employee testimony that they worked more hours than reflected on the payroll records:** The piece rate tickets which were at-

---

Sundays, 5 to 6 a.m. to 10 or 10:30 a.m.  Id. at 5:20-21.  Only worked a few Sundays. Id. at 5:15-16.  Work dropped off by about 25% last few months. Id. at 35:5-14.  However, still worked overtime.  Id. at 52:23-25, 72:25-73:2. **Carina Rangel: 65 hours per week:** Mondays through Fridays, 6 a.m. to 6 p.m.  Tr., (2/18/10) 75:5-10; Saturdays, 6 a.m. to 2 p.m. Id. at 75:11-16. Worked "every" Saturday.  Id. at 75:19-20. Did not work Sundays. Id. at 75:17-18. **Oscar Fuentes: 59 hours per week:** Mondays through Fridays, 7 a.m. to 6 p.m.  Tr., (2/18/10) 81:14-17, 25; 82:1-2; Saturdays, 7 a.m. to 2 p.m.

**PLAINTIFF'S CLOSING BRIEF**                                                11

1  tached to the weekly timecards for piece rate employees were not complete.  Juan Carlos

2  Montoya testified that the piece rate sheet in Exh. 126 was only the first page of several

3  pages he turned in every week, and that one sheet of piece rate stickers represented two

4  to four days of work. Tr., (2/18/10) 9:16-20. He also testified if a page had been num-

5  bered, it meant that there was more than one page of piece rate tickets. Tr., (2/18/10)

6  10:2-4. The employees were paid by check for the amount of piece rate tickets shown on

7  the first page and in cash for the remaining piece rate tickets.  Tr., (2/18/10) 7:12-10:9.

8  Manuel Matias testified that the piece rate sheet in Exh. 126 was only one of two to three

9  sheets turned in each week. Tr., (2/17/10) 11:1-16. He was paid by check for the piece-

10  work reflected on the first sheet and in cash for the piece work reflected on the remain-

11  ing sheets.  Matias numbered the piece rate sheets he turned in. Tr., (2/17/10) 9:22-12:2.

12       (G) **Surveillance supports the 6:00 a.m. to 6:00 p.m. work schedule:** The sur-

13  veillance performed by Investigator Leung, supra, corroborates a general work pattern of

14  6:00 a.m. to 6:00 p.m. Monday through Friday, and from 6:00 a.m. to 12:00 p.m. or later

15  on Saturdays.  Investigator Leung conducted seven days of surveillance over four weeks,

16  consisting of five weekdays and two Saturdays.  Over the five weekdays, he observed

17  the shop four times between 6:00 a.m. and 7:00 a.m. He observed the shop on five occa-

18  sions between 5:00 p.m. and 6:00 .pm. (Exh. 122.)  For example, Investigator Leung ob-

19  served that on Tuesday July 3, 2007 at 6:10 a.m., Best Miracle was open and had 30 plus

20  employees inside, 35 employees left between 5:00 p.m. and 6:00 p.m., and as of 6:15

21  p.m., the shop was still open and nine vehicles remained parked at the shop.  On Thurs-

22  day July 5, 2007, 30-40 employees were at the shop at 7:00 a.m. and most vehicles were

23  still parked at the shop as of 5:15 p.m. On Saturday July 14, 2007, 30-40 employees

24  were working at 8:15 a.m., and 25 plus employees remained at the shop at 3:45 p.m.

25       Accordingly, the Secretary has met her burden by showing at least 60 hours work-

26

27

28  Id. at 81:19-20; Worked every Saturday. Id. at 81:19, 23-24. Did not work Sundays. Id.
   at 81:21-22.

**PLAINTIFF'S CLOSING BRIEF**                                              12

1    ed and paid at straight time as established by the testimony of 9 employees regarding

2    their work schedule of 6:00 a.m. to 6:00 p.m. Monday through Friday, plus Saturdays

3    and Sundays, supported by the surveillance conducted by DOL and Defendants' admis-

4    sion regarding shop hours. By this evidence the Court can by "just and reasonable infer-

5    ence" find the hours worked by Defendants' employees and the pay they received.

6    **VII.  DEFENDANTS FAILED TO PAY THE MINIMUM WAGE REQUIRED BY**

7    **THE FLSA**

8            The Secretary contends that Defendants violated the provisions of Sections 6 and

9    15(a)(2) of the FLSA, 29 U.S.C. § 206 and §215(a)(2), by paying their employees wages

10   at rates less than the appropriate minimum wage during the subject period. During the

11   subject period, the minimum wage rate was $5.15 per hour for work performed prior to

12   July 24, 2007, and $5.85 per hour for work performed on July 24, 2007 and after. Exh.

13   175 (Admitted Fact) No. 18.

14           Defendants claim that they did not make any cash payments to employees.  Tr.,

15   (2/25/10) 47:25 – 48:5. Defendants failed to provide any cash pay records. Leung Tr.,

16   (2/23/10) 59:23-24, 62:16-21, 64:5-25.  Minimum wage violations exist if Defendants

17   are not given a cash credit in the backwage calculation (See Sec. IX).

18   **VIII.  REPRESENTATIVE SAMPLE**

19           It is well established that "[e]ach employee need not testify in order to make out a

20   prima facie case of the number of hours worked as a matter of 'just and reasonable infer-

21   ence.'" Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 472 (11th Cir. 1982).  The

22   Ninth Circuit has held that "[t]he Mt. Clemens Pottery standard allows district courts to

23   award back wages under the FLSA to non-testifying employees based upon the fairly

24   representative testimony of other employees."  Ho Fat Seto, 850 F.2d at 589.  Based on

25   representative testimony, a court may conclude that a prima facie case has also been

26   made for non-testifying employees. Brennan v. Gen. Motors Acceptance Corp., 482

27   F.2d 825, 829 (5th Cir. 1973).  "There is no requirement that to establish a Mt. Clemens

28   pattern or practice testimony must refer to all nontestifying employees . . . The require-

**PLAINTIFF'S CLOSING BRIEF**                                                                 13

1  ment is only that the testimony be fairly representative." <u>Donovan v. Bel-Loc Diner,</u>
2  <u>Inc.</u>, 780 F.2d 1113, 1116 (4th Cir. 1985), <u>disapproved of on other grounds by</u>
3  <u>McLaughlin v. Richland Shoe</u>, 486 U.S. 128, 131 n.1 (1988).  Even if the representative
4  testimony is "inconsistent in terms of exact days and hours of overtime worked," a court
5  may find, "as a matter of just and reasonable inference," that all employees regularly
6  worked excess time.  <u>Ho Fat Seto</u>, 850 F.2d at 589.

7       No fixed ratio exists for determining what percentage of employees must testify in
8  order to satisfy a plaintiff's burden.  Here, the Secretary presented evidence from nine
9  out of 47 employees for whom she is seeking backwages, or approximately 19%.  In
10  other cases involving similarly small employee populations, a limited number of em-
11  ployee positions, and uniform work tasks, courts have found a small number of employ-
12  ees representative of the whole.  In <u>Ho Fat Seto</u>, which was also a garment sewing shop,
13  the court found that five testifying employees established a prima facie case on behalf of
14  themselves and 23 non-testifying employees (18%).  <u>Id.</u> at 589.  Only seven out of 200
15  employees testified in <u>Mt. Clemens Pottery</u> (3.5%).  <u>See also</u> <u>McLaughlin v. Dia-</u>
16  <u>lAmerica Marketing</u>, 716 F. Supp. 812, 824 (D.N.J. 1989) (43 of 393 market telephone
17  researchers was sufficiently representative testimony for all employees (11%)).

18       Here, the testimony from 19% of Best Miracle employees for whom recovery is
19  sought is at -- or above -- the percentage found satisfactory in other cases. As such, the
20  Secretary submits that the nine testifying employees constitute representative testimony
21  of the 47 employees on whose behalf recovery is sought.

22  ## IX.  BACKWAGE COMPUTATIONS

23       The determination of backwages due would be made much easier if Defendants
24  maintained an accurate record of hours worked, produced their cash pay records, and
25  had not engaged in record falsification.  Because Defendants failed to maintain an accu-
26  rate record of hours worked and wages paid, DOL's Wage Hour Division ("Wage
27  Hour") reconstructed the backwages in this case. Huerta Tr., (2/23/10) 90:2-16. To re-
28  construct backwages, estimates are made as to the number of hours worked, the average

**PLAINTIFF'S CLOSING BRIEF**                                                                14

1  weekly pay, and the number of workweeks for which those assumptions apply.  Id.

2  90:6–91:20.  Wage Hour estimated the hours worked as 60 hours per week, and recon-

3  structed the payroll to include a credit of $200 per week for wages paid in cash to each

4  employee that did not appear in the payroll records.  To calculate unpaid minimum

5  wage, Wage Hour divided each employee's earnings by the number of hours worked, to

6  obtain the hourly rate.  Where that rate fell below the applicable minimum wage, Wage

7  Hour calculated the underpayment.

8       Overtime must be paid at a rate of time and one-half an employee's regular rate

9  for all hours worked in excess of 40 hours in a workweek.  In calculating backwages, the

10 regular rate must be at least equal to the state's minimum hourly rate. 29 C.F.R. § 778.5.

11 The state minimum wage was $6.75 through December 31, 2006, and $7.50 starting on

12 January 1, 2007. Exh. 175 (Admitted Fact) No. 19.  Therefore, for those employees

13 whose regular rate was below $6.75 (or $7.50) per hour, Wage Hour calculated the dif-

14 ference between $6.75 (or $7.50) and the regular rate and multiplied that amount by 60,

15 i.e., the total number of hours worked in each workweek, to obtain the regular rate due.

16 To obtain the unpaid half time, Wage Hour multiplied the number of hours worked over

17 40 by one half of $6.75 (or $7.50).  In addition, 29 C.F.R. § 778.111 governs calculation

18 of overtime for piece rate employees.  Total weekly earnings are divided by the number

19 of hours worked in the workweek to arrive at the average hourly rate. Half of that rate is

20 then multiplied by the hours over 40 in a workweek to arrive at the overtime premium.

21 The calculations in this case were performed pursuant to this regulation. Leung Tr.,

22 (2/23/10) 71:15-21, 72:7-15.

23 ### A.  Average Hours Worked: 60 per week

24       As discussed above, employees testified that their regular work schedules were,

25 on average, between 59-78 hours per week. Wage Hour reconstructed the hours worked

26 per week at 60 hours. Exh. 107; Huerta Tr., (2/23/10) 93:22-94:12.  The 60 hours esti-

27 mate took into account any variations in work schedules and absences from work due to

28 various reasons. Huerta Tr., (2/23/10) 94:13-24.  The 60 hours estimate also provided for

**PLAINTIFF'S CLOSING BRIEF**                                                              15

a 30 minute lunch credit for Monday through Saturday. Id., 94:4-7.

## B.  Average Weekly Pay: $450 / $200 Weekly Cash Credit

Wage Hour estimated approximately $450 as the average weekly pay, estimating $250 as the average earning shown on payroll and $200 credit for wages paid in cash but not shown on Defendants' records.  Exh. 107; Huerta Tr., (2/23/10) 95:3 - 7.  Even though Defendants have continuously denied any cash pay and have not produced any cash pay receipts, Wage Hour applied the $200 cash credit based on information received from employees during the investigation. Tr., (2/23/10) 95:8-10; 124:22. During the trial, employees provided wide ranges of the amount of cash they received per week, ranging from $120 – $1200 a week,[5] although the higher amounts were less frequent. E.g., Tr., (2/18/10) 15:17-19.

The application of the $200 cash credit has a direct impact on the backwages due to the employees.  If no cash credit is applied, the backwages due would be higher; alternately, if a cash credit higher than $200 is applied, the backwages would also be higher.  Adding the $200 cash credit lowers the backwages due because it brings the average hourly pay up to $7.50 ($450 average weekly pay / 60 hours) or the California minimum wage ($6.75 for part of the period).  Without the cash credit, there would be a separate liability in overtime workweeks to bring the average pay up to the California minimum wage.  Huerta Tr., (2/23/10) 92:7 – 93:14.  A cash credit higher than $200 would increase the overtime backwage liability because it would increase the average hourly pay above $7.50, thereby increasing overtime due.  Id., 95:16 - 96:4. Therefore,

---

[5] **Resendiz**, (2/16/10), 148:8-12; 149:1-10 (received $100 in cash per week); **Matias**, (2/17/10), 11:23-12:7; 14:6-11 (received $100-200 or $500-700 in cash per week); **Rios**, (2/17/10), 79:9-21 (received weekly salary of $500, portion paid by check and remainder by check); according to the Payroll Summary (Exh. 85-3), Rios' average weekly pay by check was roughly $240, making approximately $260 the cash pay per week;  **Alvarez**, (2/17/10), 121:23-122:10; 124:2-5; 166:11-17 (received about $100 to $120 per week in cash); **Montoya**, (2/18/10), 7:18-20; 15:13-23 (received $180 up to $1,200 in cash per

1    the $200 cash credit applied by Wage Hour is conservative since, as explained above, a

2    higher or lower cash credit would increase the backwage liability.

3        **C. Reduction of Overtime Workweeks**

4        Assistant District Director Huerta did not estimate 60 hours worked for every

5    workweek in the subject period.  Rather, Wage Hour applied a 15% reduction to em-

6    ployees who worked more than a year and for whom it had very accurate information.

7    Wage Hour applied no discount for employees who worked less than a year and for

8    whom it had very accurate information.  For employees for whom Wage Hour had less

9    than very accurate information, a 50% reduction was applied.  Huerta Tr., (2/23/10)

10    97:8–19.  A reduction was applied to account for holidays, slow periods, and various

11    employee absences. Id., 97:20-98:3.  For employees who were employed more than a

12    year, overtime was computed in 26 to 44 of the 52 workweeks. See Exh. 107.

13        Therefore, Wage Hour's backwage estimate is conservative and applies three lev-

14    els of reductions to the backwages due: (1) the number of hours is estimated at 60, de-

15    spite employee testimony ranging from 59-78 hours; (2) the average weekly pay in-

16    cludes a $200 cash credit; and (3) the number of workweeks in which overtime is as-

17    sumed to be worked is reduced by between 8–26 workweeks a year for employees who

18    worked for more than one year.

19        The Secretary contends that Defendants' underpayments of minimum wage for the

20    period of 8/29/05 through 9/4/05 (pay date 9/9/05) through pay period 8/6/07–8/12/07

21    (pay date 8/17/07) is $3,405.00 (if the $200 cash pay is credited to the benefit of the De-

22    fendants) or $124,083.00 if cash pay is not credited.  Unpaid overtime for the same pe-

23    riod is $172,832.50 with cash pay credited, or $391,633.50 if it is not. See Exh. 107.

24    **X.  DEFENDANTS BEST MIRACLE, THUY THI LE AND TOAN VAN**

25    **NGUYEN ARE "EMPLOYERS" WITHIN THE MEANING OF THE FLSA**

26

27

28    week); **Fuentes**, (2/18/10), 86:15-25; 93:12-21 (received $400 in cash per week, al-
      though the amount would vary).

1    Defendants Le and Nguyen are "employers" within the meaning of the FLSA Sec-
2  tion 3(d), 29 U.S.C. 203(d).  Defendants have admitted that Defendants Best Miracle and
3  Thuy Thi Le are employers.  Exh. 175 (Admitted Facts) No. 7, 8, and 12.  The Secretary
4  contends that Defendant Nguyen is also an employer as he had the authority to hire and
5  fire employees, set wages, hours and working conditions and other conditions of em-
6  ployment, and had knowledge that employees were performing work for which they
7  were not paid in conformance with the FLSA.

8    The Supreme Court has characterized the Act's statutory definition of an "em-
9  ployer" as the "broadest . . . that has ever been included in any one act." United States v.
10  Rosenwasser, 323 U.S. 360, 363 n.3 (1945).  The Ninth Circuit has explained that
11  "[w]here an individual exercises 'control over the nature and structure of the employ-
12  ment relationship,' or 'economic control' over the relationship, that individual is an em-
13  ployer within the meaning of the Act."  Lambert v. Ackerley, 180 F.3d 997, 1012 (9th
14  Cir. 1999) (citations omitted).

15    The Ninth Circuit has applied a four part "economic reality" test to be applied for
16  determining whether an individual is an employer. The factors to be applied are whether
17  the alleged employer: (1) had the power to hire and fire employees, (2) supervised and
18  controlled employee work schedules or conditions of employment, (3) determined the
19  rate and method of payment, and (4) maintained employment records.  Gilbreath v. Cut-
20  ter Biological, Inc., 931 F.2d 1320, 1324 (9th Cir. 1991). The Ninth Circuit made it clear
21  however, that these factors are merely guidelines; "they are not etched in stone and will
22  not be blindly applied." Id.

23    Defendant Nguyen was an employer within the meaning of the FLSA because he
24  satisfied the above four factor test: he had the power to hire or fire employees, set em-
25  ployee work schedules, determined method of employee payment, and created employ-
26  ment records.  First, Defendant Nguyen rehired Juan Carlos Montoya after Defendant Le
27  had fired him.  Montoya, (2/18/10), 14:15 -15:12. Second, Defendant Nguyen gave em-
28  ployee Oscar Fuentes permission to start work at 7:00 a.m. when other employees

**PLAINTIFF'S CLOSING BRIEF**                                                    18

1    started at 6:00 a.m.. Fuentes, (2/18/10) 82:17 - 23). Defendant Nguyen also told employ-

2    ees to punch in for less than eight hours per day. Matias, (2/17/10) 9:3-12. Third, Defen-

3    dant Nguyen explained the pay process to employees and explained that the hours on the

4    fraudulent timecard were to be paid by check and the balance of work was to be paid in

5    cash. Resendiz, (2/16/10) 148:8-12. In addition, Defendant Nguyen handed out cash

6    pay to employees. Baez, (2/16/10) 65:14-16; Montoya, (2/18/10) 12:7-10; Fuentes,

7    (2/18/10) 87:1-7. Moreover, Defendant Nguyen prepared falsified timecards and asked

8    employees to sign them. Alvarez, (2/17/10) 120:19-22; 57:6-8; Resendiz, (2/16/10)

9    148:2-7. Fourth, Defendant Nguyen admitted that he prepared Best Miracle employment

10   records by recording the hours worked on the employee time or wage sheet, which was

11   used to prepare payroll checks, which he then signed. Tr. (2/25/10) 66:12–16; 62:18-24).

12          Defendant Nguyen's testimony that he had a limited role in Best Miracle is not

13   credible since both he and Defendant Le consistently understated his role in the various

14   garment shops they operated. Defendant Nguyen testified that he only helped his wife at

15   G Services, when in fact he later admitted he was its President and Chief Executive Of-

16   ficer. Nguyen, (2/25/10) 63:4-23. Defendant Le testified that Defendant Nguyen only

17   cut thread at Double T. Corporation ("Double T"). Le, (2/24/10) 78:14-17. However,

18   Defendants' own witness testified that Defendant Nguyen was her supervisor at Double

19   T. Mendoza, (2/24/10) 59:12-15.

20          Therefore, Defendant Nguyen is an employer within the meaning of the FLSA. As

21   stated above, Defendants Best Miracle and Le already admit they are employers. Exh.

22   175 Admitted Facts No. 7, 8, and 12. As employers, the individual Defendants are

23   jointly and severally liable with the corporate Defendant for backwages that may be

24   found to be due to Best Miracle employees. Donovan v. Hamm's Drive Inn, 661 F.2d

25   316 (5th Cir. 1981).

26   **XI. DEFENDANTS' VIOLATIONS WERE "WILLFUL," TRIGGERING A**

27   **THREE YEAR STATUTE OF LIMITATIONS**

28          This action is subject to a three year statute of limitations because Defendants'

**PLAINTIFF'S CLOSING BRIEF**                                                          19

violations of the FLSA were willful.  Defendants were aware of the Act's requirements but, in a carefully orchestrated and calculated fashion, deliberately and repeatedly violated these provisions. Defendants deliberately falsified timecards to appear that employees worked fewer hours, and paid employees "off the books" in cash to hide these hours worked. Moreover, Defendants' prior violations at Double T evidence their continued refusal to comply with the FLSA.

A three year statute of limitations is imposed on employers who "willfully" violate the FLSA pursuant to Section 6(a) of the Portal to Portal Act, 29 U.S.C. § 255(a). A violation is considered "willful" if the employer knew or showed reckless disregard as to whether its conduct violated the Act. McLaughlin v. Richland Shoe, 486 U.S. 128 (1988).  Reckless disregard may be shown by repeated violations, the falsification or withholding of required records, or other attempts to evade the Act's requirements. See, e.g., Martin v. Deiriggi, 985 F.2d 129, 136 (4th Cir. 1992) (affirming willfulness finding based on evidence of knowing violation, including evidence that employer withheld records to impede DOL); Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 967 (6th Cir. 1991) (affirming willfulness finding where employer had actual knowledge of Act's requirements from earlier DOL investigation, previously agreed to pay overtime and comply with Act, but failed to do so).

Defendants' violations are willful since they admitted knowledge of the FLSA requirements, Exh. 175 Admitted Facts 15 and 16; Le (2/24/10) 83:24-85:7.  In addition, Defendants engaged in wide-ranging record falsification which included preparing fraudulent timecards using a second time clock, instructing employees to punch in for fewer hours than they worked, and requiring employees to sign blank timecards.[6]  More-

---

[6] **Baez**, (2/16/10), 66:6-20 (at times would sign blank timecards); 65:21-66:5 (two sets of timecards – one accurate and one inaccurate); **Resendiz**, (2/16/10), 147:25-148:12 (Defendant Nguyen gave him timecards to sign that did not accurately reflect all hours worked; Defendant Nguyen told him to sign inaccurate timecards and he would be paid in cash for additional hours worked that were not reflected on the timecards); **Matias**,

1  over, Defendants admitted that the fraudulent timecards were designed to mislead the

2  Department of Labor.[7]

3      Further, Defendant Le was the owner or operator of Double T, a garment shop

4  that immediately predated Best Miracle. The fact that Defendant Le operated Double T

5  is established by employee testimony from both the Secretary's and Defendants' wit-

---

7  (2/17/10), 8:24-9:21 (punched timecard that understated hours worked because Defen-

8  dants Le and Nguyen told him and other employees to punch a maximum of eight hours

9  per day only); 9:25-12:2 (a portion of his piece rate tickets were paid by Defendant Le in

   cash); **Benitez**, (2/17/10), 56:18-58:4 (there were two sets of timecards and he was given

10  an inaccurate timecard by Defendant Le or Nguyen to sign; the inaccurate timecards

11  were either blank or already filled in with reduced hours); **Rios**, (2/17/10), 80:20-81:4

12  (punched timecards that underreported hours worked because Defendants Le and

   Nguyen told him to do so); **Alvarez**, (2/17/10), 120:6-121:5 (two sets of timecards and

13  Defendant Nguyen punched the inaccurate timecards that underreported hours worked

14  and gave these cards to Alvarez to sign; manager Orlando Sanchez informed him that if

   he did not sign the inaccurate timecards, he would lose his job); 159:22-162:4 (Alvarez

15  witnessed Defendant Nguyen with a second time clock that he used to punch a second

16  set of timecards); **Montoya**, (2/18/10), 7:12-20 (a portion of his piece rate tickets were

17  paid by Defendant Le in cash); 11:8-12:10 (there were two sets of timecards and that he

   was paid by check for the hours reflected on the underreported timecard and in cash for

18  the remaining hours; Defendant Le had him sign the timecard and Defendant Nguyen

19  would hand out cash); 41:1-44:9 (Montoya witnessed Defendant Nguyen and Son Dau

   punch timecards from either time clock on the wall or from second time clock in office

20  area); **Fuentes**, (2/18/10), 84:3-85:13, 87:1-7 (two sets of timecards; he was paid by

21  check for hours reflected on underreported timecard and in cash for remaining hours;

   Defendants Le or Nguyen handed out cash pay).

22

23  [7] **Baez**, (2/16/10) 75:8-79:10 (Defendants Le and Nguyen told employees on five or six

   occasions to provide false information to investigators regarding their work hours;  De-

24  fendant Le threatened to retaliate against employees who did not lie about their work

25  hours); **Matias**, (2/17/10) 29:4-16 (Defendant Le told employees to understate hours on

   timecards so that if there were a DOL investigation, "everything would be in order");

26  **Alvarez**, (2/17/10) 121:8-22 (Defendant Nguyen told Alvarez that they kept a second set

27  of timecards for a possible DOL inspection); 143:22-144:6 (Defendant Le and Best

   Miracle manager Orlando Sanchez told Alvarez that they kept a second set of timecards

28  to prevent them from getting fined by the DOL).

**PLAINTIFF'S CLOSING BRIEF**                                                          21

nesses who testified that they believed she was their boss.[8]  In addition, Defendant Le made the adoptive admission that she operated Double T.  Leung, (2/19/20 Vol. II) 33:14-34:3; FED. R. EVID. 801(d)(2)(B).  Double T engaged in similar FLSA violations as Best Miracle (Exh. 158).  DOL investigated this practice, found it to be illegal, and Double T agreed to pay the backwages and comply with the FLSA. (Exh. 156).  Despite this knowledge, Defendant Le willfully engaged in similar violations at Best Miracle, making this action subject to a three year statute of limitations.

## XII.  DEFENDANTS VIOLATED FLSA'S "HOT GOODS" PROVISION

Under Section 15(a)(1) of the FLSA, it is unlawful for any person to transport, offer for transportation, ship, deliver or sell in commerce, or ship, deliver or sell with knowledge that shipment, delivery or sale in commerce is intended, any goods in the production of which any employee was employed in violation of Section 6 or 7 of the FLSA, 29 U.S.C. § 215(a)(1).

The Supreme Court has held that "exclusion from interstate commerce of goods produced under substandard conditions is not simply a means to enforce other statutory goals; it is itself a central purpose of the FLSA." Citicorp Industrial Credit v. Brock, 483 U.S. 27, 36, n.8, 107 S.Ct 2694, 97 L.Ed.2d 23 (1987). The broad nature of Section 15(a)(1) is necessary to promote a critical purpose of the FLSA:  to maintain a level playing field for employers by preventing the introduction of substandard goods into the

_____

[8] Best Miracle employees testified that Defendant Le was the owner and their boss or manager at Double T. Tr.: **Baez**, (2/16/10), 69:21-70:6 (Defendant Le was Baez's boss at Double T and that Defendant Le told her that she was the owner of Double T); **Matias**, (2/17/10), 15:20-21 (Defendant Le was his boss at Double T); **Rios**, (2/17/10), 82:6-9 (Defendant Le was his boss at Double T); **Montoya**, (2/18/10), 14:3-5 (Defendant Le was the owner of Double T); **Fuentes**, (2/18/10), 87:21-24 (Defendant Le was his boss at Double T).
Even Defendants' own witnesses admitted the Defendant Le was their manager at Double T. Corporation. Tr.: **De La Rosa**, (2/24/10), 24:5-22 (admitting that Defendant Le was the manager at Double T); **Gonzales**, (2/24/10), 59:3-11 (admitting that both Defendants Le and Nguyen were her supervisors at Double T).

stream of commerce so that non-complying employers do not gain an advantage over those who comply with the FLSA.  Id. at 36-37.  See also Herman v. Fashion Headquarters, Inc., 992 F. Supp. 677, 679 (S.D.N.Y. 1998) ("Because hot goods are produced more cheaply, they provide a competitive advantage to those who violate the FLSA and a comparative disadvantage to law-abiding manufacturers and distributors.").

This violation is supported by the substantial evidence of recordkeeping, minimum wage and overtime violations set forth above, and the following evidence.  Best Miracle employees worked on goods for garment manufacturers Moa Moa and Byer of California throughout the subject period. (Exh. 175, Stipulated Facts 13 and 14).  Moa Moa's general manager, Yong Chung, testified that Moa Moa shipped goods produced by Best Miracle to various locations outside of the state of California throughout the subject period.  (2/19/10 Vol. I) 37:21-24.  In addition, Moa Moa shipped goods that DOL had restrained from shipment after being advised by Defendant Le to ship. Chung, (2/19/10 Vol. I) 10:14-11:11, 14:2-16; Leung, (2/19/10 Vol. II.) 15:14-16:13; Exh. 135. Chung Tr., (2/19/10 Vol. I) 15:3-23; Exh. 130; Exh. 134.

Therefore, Defendants violated this "hot goods" provision when they shipped garments to Moa Moa and Byer throughout the subject period.  As these goods were produced by Best Miracle employees who were not paid the minimum wage and overtime required under the Act, the goods were "hot" and a hot goods violation occurred. Moreover, Defendant Le caused Moa Moa to ship additional goods even after both parties were notified by DOL that the goods were "hot."

## XIII. DEFENDANTS FAILED TO MEET THEIR BURDEN

As previously stated, under Mt. Clemens, once the accuracy of the employer's records is undermined, the burden shifts to Defendants.  Where the employer has failed to keep accurate or adequate records as required by the Act, the Secretary's burden of showing the extent of uncompensated work is reduced.  Martin v. Deiriggi, No. 88-0064-C(K), 1991 WL 323416, at *9 (N.D.W.Va. Dec. 12, 1991).  In contrast, the burden on Defendants to show the precise amount of work performed is a heavy one, be-

cause otherwise they would benefit from having violated the record-keeping require-ments of the Act. Id. at *10. Defendants failed to establish the precise number of hours worked or present other evidence sufficient to negate the reasonableness of the inference to be drawn from the Secretary's evidence regarding employee work hours. Defendants' only argument appears to be that their records are accurate and that employee witnesses were not truthful regarding their hours worked. Defendants called nine witnesses to tes-tify, but only two of them, Jaime De La Rosa and Defendant Le attempted to contravene the testimony of the Secretary's employee witnesses that they worked over 60 hours per week. De La Rosa (2/24/10) 8:5-6; 11:24-12:8; Le (2/24/10) 107:9-12. However, the tes-timony of these two witnesses is not credible, as explained below. An employer fails to meet his burden to negate the reasonable inferences drawn from representative employ-ees' testimony if the fact finder determines the employer's witnesses are not credible. Ho Fat Seto, 850 F.2d at 590. Consequently, under the rationale of Mt. Clemens, Plaintiff's claims for back wages should be sustained.

## A. Defendants' Employee Witnesses are Not Credible[9]

Defendants presented testimony of seven former employees. Two of the employ-ees, Lilia Avila and Antonia Gonzalez Mendoza, are not included in the group of 47 em-ployees for whom the Secretary seeks backwages (Exh. 107). Therefore, even if found credible, their testimony bears little relevance to the instant matter. Moreover, two other employees, Maria Carmen Diaz and Maria Rodriguez, are dinner companions and

---

[9] Some courts exercising equitable powers have held that employees who falsely testify that they are not owed backwages should not be permitted to receive backwages calculated for them. Since it would not be in the public interest to allow Defendants to profit from their violations by keeping the money for themselves, these courts have or-dered the defendants to pay to the registry of the Court an amount equal to the back-wages which would otherwise go to these employees. See Dole v. Bishop, 740 F. Supp. 1221, 1229 (S.D. Miss. 1990); Martin v. Deiriggi, supra, 1991 WL 323416, at *9. Simi-larly, the Court exercising its equitable powers may order the DOL to recalculate the wages due without Defendants receiving the benefit of the $200 cash credit. (Sec. 9B) Since Defendant Le explicitly testified that no cash payments were made by Defendants.

1   friends of Defendant Le.  Diaz, (2/23/10) 160:3-162:7.  Finally as discussed below, the

2   other three employee witnesses who testified for Defendants, Orlando Sanchez, Jaime

3   De La Rosa, Son Dau, were either in managerial roles or carried out some of the record

4   falsification and witness manipulation on behalf of Defendants.

5       **Cash Pay:** Maria Rodriguez, Maria Carmen Diaz, Lilia Avila, Antonia Gonzalez,

6   and Jaime De La Rosa all testified that they did not take many workweeks off and were

7   always paid with a payroll check, yet as explained in Section V(I), the payroll register

8   shows that they are missing from the payroll for numerous workweeks. This evidence

9   compels the finding that they were working "off the books," and did not tell the truth

10  about being paid in cash.

11      **Double T Work Hours:** Son Dau, Antonia Gonzalez, Jaime De La Rosa, and Or-

12  lando Sanchez all testified that they did not work over 40 hours a week at Double T and

13  that they generally worked the same hours at Double T as at Best Miracle. Sanchez

14  (2/23/10), 171:7-24; De La Rosa (2/24/10), 24:23-25:3; Gonzalez (2/24/10), 60:11-22;

15  Dau (2/25/10), 55:5-20.  However, the statement signed by Defendant Le's sister in De-

16  fendant Le's presence (Exh. 158) was an adoptive admission by Le, FED. R. EVID.

17  801(d)(2)(B), states that Double T employees worked about 60 hours per week with a

18  schedule of 6:00 a.m. to 6:00 p.m. Moreover, backwages for Son Dau, Antonia Gon-

19  zalez, Jaime De La Rosa, Orlando Sanchez, were calculated and agreed to by Double T

20  (Exh. 154).  These four witnesses are not credible since their testimony contradicts the

21  very admissions made by Double T and Defendant Le that these employees worked 60

22  hours a week at Double T.

23      **Jaime De La Rosa:** Jaime De La Rosa was not a credible witness.  He testified

24  that he left work at 3:30 p.m. every day and that all other employees left and the shop

25  was empty at 3:30 p.m.  (2/24/10) 11:24-12:8.  This testimony is even contradicted by

26  the fraudulent timecards (Exh. 13) and every other witness, including Defendant Le.

27  Moreover, Mr. De La Rosa claimed that he did not remember Defendant Le's name

28  when asked who his manager was at Double T.  Id., 24:5-22. Finally, Mr. De La Rosa

**PLAINTIFF'S CLOSING BRIEF**                                                    25

1   was impeached on the stand about having lied about meeting with Defendants' attor-

2   neys, despite the fact that he had gone to the law offices of Defendants' attorneys to pro-

3   vide a sworn statement only a few months prior.  Id.,16:14-15, 26:19–29:20; 34:7-35:3.

4   **Orlando Sanchez:** Orlando Sanchez was not a credible witness.  At trial, Mr.

5   Sanchez denied that he was a manager at Best Miracle. (2/23/10) 172:18-19.  This denial

6   is contradicted by Best Miracle employees.  Tr.: Alvarez, (2/17/10), 120:23-121:7 (San-

7   chez was manager and Alvarez signed inaccurate timecard because Sanchez told him

8   that he would lose his job if he did not sign it); id., 121:14-18 (when Alvarez was first

9   hired, Sanchez (and Defendant Le) explained the two timecard system to him); see id.,

10  133:12-14 (Alvarez asked Sanchez about his work hours because Sanchez had supervi-

11  sorial authority); see id., 136:15-16 (Sanchez confirmed pieces produced because San-

12  chez had supervisorial authority); id., 142:2-21, 144:1-6 (Sanchez told him about throw-

13  ing away timecards); id.,146:3-9 (Sanchez told Best Miracle employees to stay on the

14  premises when no work was available to await the arrival of more work).  Even Defen-

15  dants' own witnesses admitted that Orlando Sanchez would act as a supervisor at Best

16  Miracle when Defendant Le was not present at the shop.  Gonzalez Mendoza, (2/24/10),

17  58:12-17.  Finally, Mr. Sanchez admitted that he is seeking future employment from De-

18  fendant Le, thus providing an incentive for him to provide testimony favorable to De-

19  fendants. Tr., (2/23/10) 177:2-7.

20  **Son Dau:**  Defendants trusted Son Dau enough to permit him to create the fraudu-

21  lent timecards for employees.  Montoya, (2/18/10) 41:1-44:9 (Montoya witnessed De-

22  fendant Nguyen and Son Dau punch his timecards from either time clock on the wall or

23  from second time clock in office area).  Dau was also given the authority to open the

24  Best Miracle shop location at 6:00 a.m.  Id., 41:7-12; 72:3-17.

25  **B. Defendants Le and Nguyen Are Not Credible.**

26  **Le was not Truthful Concerning Her Employment with CMD**

27  Defendant Le was not a credible witness.  She misled the Court about her previous

28  experience and involvement in the garment industry.  Defendant Le testified falsely that

**PLAINTIFF'S CLOSING BRIEF**                                                         26

1  she was hired by and worked for CMD as a production manager, which she claimed was

2  a garment shop.  (2/24/10) 67:18-69:1.  She explicitly denied that she hired CMD as an

3  employee leasing company/payroll service to help her operate various garment shops.

4  (2/25/10) 11:3-8.  However, CMD Chief Executive Officer, Jay Shen, testified as an im-

5  peachment/rebuttal witness that CMD is a payroll processing service and worker's com-

6  pensation insurance service provider.  (2/25/10) 70:10-12.  Shen testified that: Defen-

7  dants Le and Nguyen were customers of CMD from 2000 to 2005; Defendants Le and

8  Nguyen were never CMD employees since CMD is a payroll processing firm. Id.,

9  71:12–73:9.  Shen also testified that he knew Defendant Le and Defendant Nguyen were

10  the owners of the various shops for which CMD was providing services because when

11  he delivered the payroll to them, they wrote checks to him to cover the payroll, workers

12  compensation insurance, employer taxes and CMD's fee. Id., 77:3-10.

### Le was Not Truthful About her Experience at Double T and G Services

14       At trial, Defendant Le testified that she worked for Double T. (2/24/10), 66:22.

15  She claimed that she trained her sister (Double T's purported owner) about production,

16  dealing with employees, and interacting with customers, and that she was paid a salary

17  by Double T. Id., 73:16-75:11.

18       In contrast, during her deposition, Defendant Le denied any involvement whatso-

19  ever with Double T. Corporation.  She testified among other things that: she knew noth-

20  ing about Double T, (2/25/10) 26:17-27:2; she was never paid by Double T, id., 27:4-8;

21  she never gave any advice to Double T or to her sister with respect to Double T, id.,

22  27:22–28:8; she never gave business advice with respect to operating Double T., dealing

23  with employees, getting customers, anything of that nature. Id. at 28:25-29:8.  Finally,

24  Defendant Le testified at her deposition that: "I have [sic] Double T Corporation is not

25  related to me whatsoever. I'm not going to answer questions relating to it.  Please refer

26  questions to the corporation itself. This is very unfair, you know, to ask me about Dou-

27  ble T Corporation while I know nothing about that…" Id. at 29:10-17. "I am not related

28  whatsoever to Double T…." Id. at 30:5-8.

**PLAINTIFF'S CLOSING BRIEF**                                                27

1    Further and perhaps most egregiously, to prevent the Secretary from obtaining

2    Double T payroll records which would reveal Defendant Le's role in Double T (and the

3    W-2 Report of Wages Form issued to her (Exh. 152)), Defendants abused the judicial

4    process by filing a motion to quash the subpoena served on Double T's accountant, Lan

5    Quan. Defendant Le was aware of the subpoena, and aware of the motion to quash the

6    subpoena filed by her attorneys. (2/25/10) 31:18 – 23.  Defendant Le's untruthful depo-

7    sition testimony was attached to the motion to quash as support for the motion. (2/25/10)

8    31:24-33:6. Defendant Le only acknowledged that she worked for Double T. during

9    Volume II of her deposition, <u>after</u> her Double T W-2 was ultimately produced by the ac-

10   countant. (2/25/10) 36:13-21.

11   Moreover, at trial, Defendant Le testified that G Services was a garment company

12   she owned and operated. (2/24/10) 70:23–71:4.  However, in her deposition, Defendant

13   Le claimed that she could not recall whether she ever heard the name "G Services" or if

14   she was ever affiliated in any way at any time with G Services. (2/25/10) 30:24–31:4.  It

15   strains belief that one would own and operate a company and fail to remember its name.

16   **Defendant Nguyen Was Not Truthful About His Garment Shop Ownership**

17   Defendant Nguyen similarly lacks any credibility.  At trial, Defendant Nguyen

18   testified that he was a trimmer at CMD and that he did not know that CMD was a payroll

19   service company.  (2/25/10) 66:19-20. Nguyen further denied that he and his wife hired

20   CMD to provide payroll services for the various shops they were operating. <u>Id.</u>, 66:17-

21   67:3. As shown above, this testimony was expressly contradicted by CMD CEO Jay

22   Shen.  Moreover, Defendant Nguyen's credibility is further undermined since he was not

23   truthful in his deposition when he claimed that he merely knew of G Services but did not

24   remember any information about the company or his wife's role in the company. <u>Id.</u>,

25   63:24–65:10.  At trial, Nguyen admitted that he not only owned G Services, he was its

26   CEO and President. <u>Id.</u>, 63:6-23.

27   In sum, the credibility of Defendants' witnesses has been severely undermined

28   and their self-serving testimony regarding work hours and pay practices at Best Miracle

**PLAINTIFF'S CLOSING BRIEF**                                                      28

1  is not credible. Therefore, Defendants have failed to carry their burden, compelling a

2  finding for the Secretary. See Ho Fat Seto, 850 F.2d at 590.

3  **XIV.  PREJUDGMENT INTEREST**

4      A prejudgment interest award is necessary to make whole Best Miracle's employ-

5  ees for the unlawful withholding of their wages. Ford v. Alfaro, 785 F.2d 835, 842-843

6  (9th Cir. 1986); Biggs v. Wilson, 1 F.3d 1537, 1539 (9th Cir. 1993).  It also serves to

7  remedy the competitive disadvantage faced by employers that comply with the FLSA.

8  Donovan v. Sovereign Security, 726 F.2d 55, 58 (2d Cir. 1984).

9      In this Circuit, the default prejudgment interest rate is calculated pursuant to 28

10  U.S.C. § 1961 (4.44%), "'unless the trial judge finds [ ] that the equities of a particular

11  case require a different rate.'"  Alfaro, 785 F.2d at 842. (citation omitted).  The equities

12  here so require.  By underpaying their employees, Defendants gained a competitive ad-

13  vantage over other employers that complied with the FLSA and have profited from their

14  misdeeds by retaining the money they should have paid to their employees beginning in

15  2005.

16      A reasonable alternative is the IRC rate (26 U.S.C. § 6621) (8%) used by the IRS

17  to calculate underpayments owed to the government.  This rate has been awarded in

18  FLSA and ERISA cases, e.g., E.E.O.C. v. County of Erie, 751 F.2d 79, 82 (2d Cir.

19  1984); Russo v. Unger, 845 F. Supp. 124 (S.D.N.Y. 1994), because the adjusted prime

20  rate is a good indicator of the value of the use of money.  Here, the Secretary requests

21  that this Court impose a fixed rate of prejudgment interest, at the IRC rate, compounded

22  daily, starting from the week ending August 12, 2007 (the last week worked).

23  **XV.  INJUNCTION**

24      The Secretary seeks to enjoin Defendants, pursuant to Section 17 of the FLSA, 29

25  U.S.C. § 217, from further violation of the FLSA's recordkeeping, minimum wage, and

26  overtime provisions and recovery of unpaid minimum wage and overtime compensation

27  withheld from employees.

28      The prospective injunction sought by the Secretary will not subject Defendants to

**PLAINTIFF'S CLOSING BRIEF**                                                              29

1  any penalty or hardship. It does nothing more than require Defendants to do what the

2  FLSA requires: comply with the law for the public benefit. See Brock v. Big Bear Mar-

3  ket No. 3, 825 F.2d 1381, 1383 (9th Cir. 1987); Marshall v. Chala Enters., 645 F.2d 799,

4  804 (9th Cir. 1981).  The injunction merely shifts the responsibility for compliance onto

5  Defendants' shoulders instead of upon the government.  Donovan v. Sureway Cleaners,

6  656 F.2d 1368, 1375 (9th Cir. 1981).  The purpose of an injunction under the FLSA is

7  not to punish past violations, but to stop existing violations or to prevent future infrac-

8  tions in the public interest. An injunction restraining Defendants from future violations

9  of the minimum wage, overtime and recordkeeping provisions of the FLSA should issue

10  in this case.

11          In addition, Defendants should be enjoined from the continued withholding of

12  minimum wages and overtime pay, plus pre-judgment interest. The Secretary further re-

13  quests that given Defendants' lengthy record of opening and closing similar garment

14  shops with various names, the injunction include a provision requiring Defendant Le to

15  report her employment and business location to the Department of Labor every six

16  months.

17  **XVI. CONCLUSION**

18          For the foregoing reasons, the Court should find that Defendants violated the

19  FLSA's minimum wage, overtime, recordkeeping and hot goods provisions and, pursu-

20  ant to the authority in 29 U.S.C. § 217, issue an injunction enjoining Defendants from

21  future violations of FLSA Sections 6, 7, 11 and 15, 29 U.S.C. §§ 206, 207, 211, and 215

22  and restraining Defendants from continuing to withhold the amount of $176.237.50, the

23  unpaid compensation due to the employees as set forth in Exhibit 107, plus prejudgment

24  interest calculated at the annual rate of 8% compounded daily, from August 12, 2007 to

25  date of entry of judgment.

26

27

28

**PLAINTIFF'S CLOSING BRIEF**                                                        30

Dated: March 19, 2010

M. PATRICIA SMITH
Solicitor of Labor

LAWRENCE BREWSTER
Regional Solicitor

DANIEL J. CHASEK
Associate Regional Solicitor

_____/s/_____
BORIS ORLOV, Attorney
Attorneys for the Plaintiff
U.S. Department of Labor

**PLAINTIFF'S CLOSING BRIEF**

31