JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

|  |  |
|---|---|
| **HILDA L. SOLIS, Secretary of Labor, United States Department of Labor,** | **Case No.: SACV 08-00998-CJC(MLGx)** |
| **Plaintiff,** | |
| **vs.** | **MEMORANDUM OF DECISION** |
| **BEST MIRACLE CORPORATION, THUY THI LE, and TOAN VAN NGUYEN,** | |
| **Defendants.** | |

# I.   INTRODUCTION

Plaintiff Hilda L. Solis, United States Secretary of Labor (the "Secretary"), brought this action against Defendants Best Miracle Corporation ("Best Miracle"), Thuy Thi Le, and Toan Van Nguyen (collectively "Defendants") for violations of the Fair Labor Standards Act ("FLSA") at their garment shop in Santa Ana, California.  After considering all the evidence presented by the parties at a seven-day bench trial, the Court finds that Defendants brazenly disregarded the FLSA by exploiting low-wage garment workers and requiring them to work long hours without proper compensation.  Congress enacted the FLSA in 1938 to protect workers from such sweatshop practices.  The Court now enjoins Defendants from withholding $172,832.50 in unpaid backwages and from further violating the FLSA.

# II.   BACKGROUND

Ms. Le opened Best Miracle in the summer of 2005.[1]  It was not her first foray into the garment industry.  Soon after Ms. Le immigrated to the United States from Vietnam in 1992, she began working as a seamstress.[2]  Beginning in 1999, Ms. Le owned or operated a number of garment shops in Southern California under different names, including a company called Double T, which closed in 2005.[3]  In order to obtain a business license for her garment shops, Ms. Le took classes where she learned the requirements of federal and state labor laws, including the recordkeeping and overtime provisions of the FLSA.[4]  Although Ms. Le's sister owned Double T, Ms. Le played a significant managerial role at the company, advising her sister on business matters and

---

[1] Le, 2/24/10, 66:13-17.  Citations to the trial transcript are referenced by the last name of the witness, date of testimony, and transcript page and line.

[2] Le, 2/24/10, 69:12-70:19.

[3] Le, 2/24/10, 70:23-76:7; Leung, 2/19/10 (Vol. II), 34:13-35:7; Shen, 2/25/10, 70:8-73:9.

[4] Le, 2/24/10, 83:20-85:7.

training and supervising employees.[5]  Mr. Nguyen, Ms. Le's husband, also worked for Double T as a supervisor.[6]  In 2005, the Department of Labor investigated Double T for wage and hour violations.  During that investigation, Ms. Le admitted that she operated Double T and had violated the FLSA by failing to pay her employees overtime.[7]

At Best Miracle, Ms. Le and Mr. Nguyen employed workers to trim, assemble, sew, and iron clothing for local garment manufacturers, who would, in turn, ship the clothing to retailers.  Best Miracle's employees were of Latino and Asian descent, and many of them did not speak English.  They worked long hours for little pay, routinely clocking over 60 hours per week.  On weekdays, employees would generally arrive at the Best Miracle shop at 6:00 a.m. and leave at 6:00 p.m., taking a half-hour lunch break in the middle of the day.  Best Miracle employees also generally worked from 6:00 a.m. to 2:00 p.m. on Saturdays and on occasional Sunday mornings.[8]

Ms. Le apparently did not learn a lesson on how to treat workers from her experience at Double T.  With the help of Mr. Nguyen, Ms. Le devised a system of falsifying records at Best Miracle in order to avoid paying overtime to employees.  They

---

[5] Le, 2/24/10, 73:16-75:11; Leung, 2/19/10 (Vol. II), 28:17-34:3.  Both the Secretary's and Defendants' employee witnesses testified that Ms. Le was their boss or manager at Double T.  Baez, 2/16/10, 69:21-70:6; Matias, 2/17/10, 15:10-21; Rios, 2/17/10, 82:6-9; Montoya, 2/18/10, 14:3-5; Fuentes, 2/18/10, 87:21-24; De La Rosa, 2/24/10, 24:5-22; Gonzalez Mendoza, 2/24/10, 59:3-11.
[6] Gonzalez Mendoza, 2/24/10, 59:12-15.
[7] Leung, 2/19/10 (Vol. II), 28:17-35:7; Le, 2/24/10, 76:14-22; Ex. 158.
[8] Baez, 2/16/10, 56:2-23, 57:19-58:6; Resendiz, 2/16/10, 146:1-147:5; Matias, 2/17/10, 6:12-8:16; Juarez Benitez, 2/17/10, 55:2-56:3; Rios, 2/17/10, 78:13-79:4; Alvarez, 2/17/10, 119:4-21; Montoya, 2/18/10, 4:25-5:21; Rangel, 2/18/10, 75:5-20; Fuentes, 2/18/10, 81:14-82:2.  Mr. Alvarez also testified that he worked from 6:00 a.m. to 6:00 p.m. for the first two or three months of his employment, but then worked 7:00 a.m. to 5:30 p.m. for the remainder of the six months he worked at Best Miracle.  Alvarez, 2/17/10, 119:6-21, 124:7-9, 131:14-132:3.  Two employees also testified that work tapered off during the last few months Best Miracle was open.  Matias, 2/17/10, 7:9-14; Montoya, 2/18/10, 35:5-14, 52:23-53:13, 72:25-73:2.

paid some employees by the hour and others by the piece.[9]  All of the employees, however, used timecards.[10]  Ms. Le and Mr. Nguyen instructed some employees not to punch over 40 hours a week on their timecards.  These employees would punch in hours after they arrived in the morning and punch out hours before they left in the evening.[11]  Ms. Le and Mr. Nguyen instructed other employees to keep a "real" timecard showing all of their hours and a "fake" timecard showing only 40 hours per week.[12]  Sometimes Ms. Le and Mr. Nguyen would require employees to sign blank timecards that they would later fill in with fake hours.[13]  Other times Ms. Le and Mr. Nguyen would require the employees to sign timecards they had already filled in with fake hours.[14]  To keep up the illusion of a legitimate operation, Ms. Le and Mr. Nguyen paid employees the amount on the 40-or-less timecards by check.  The remainder of hours they paid by cash at a straight rate.[15]  Ms. Le and Mr. Nguyen thus had timecards that matched the payroll in case of an inspection by the Department of Labor.  To further conceal their wrongdoing, Ms. Le and Mr. Nguyen occasionally recorded small amounts of overtime on the fraudulent timecards.[16]

Mr. Nguyen played a significant role in the operation of Best Miracle.  He filled out the time and wage sheet, determined employee schedules, signed paychecks, and paid

---

[9] Paid by the piece: Resendiz, 2/16/10, 147:6-7; Matias, 2/17/10, 8:17-18; Alvarez, 2/17/10, 119:22-23; Montoya, 5:22-23.  Paid by the hour: Juarez Benitez, 2/17/10, 56:4-5; Rangel, 2/18/10, 78:12-13.  Both: Baez, 2/16/10, 61:11-16.

[10] Baez, 2/16/10, 62:25-63:6; Resendiz, 147:12-150:9; Matias, 2/17/10, 12:8-10; Juarez Benitez, 2/17/10, 56:11-13; Rios, 2/17/10, 79:24-25; Alvarez, 2/17/10, 120:2-5; Montoya, 2/18/10, 5:25-6:2; Rangel, 2/18/10, 75:21-25; Fuentes, 2/18/10, 83:18-23.

[11] Matias, 2/17/10, 8:19-9:21, 24:22-26:25, 33:3-34:10; Rios, 2/17/10, 80:18-81:4.

[12] Baez, 2/16/10, 64:15-66:25; Juarez Benitez, 2/17/10, 56:8- 58:18; Alvarez, 2/17/10, 120:6-122:21; Montoya, 2/18/10, 11:8-13:24, 41:1-43:16; Fuentes, 2/18/10, 84:3-85:13.

[13] Baez, 2/16/10, 64:15-66:25; Juarez Benitez, 2/17/10, 69:13-14.

[14] Baez, 2/16/10, 64:15-66:25; Resendiz, 147:12-150:9; Juarez Benitez, 2/17/10, 56:8-58:18; Alvarez, 2/17/10, 120:6-122:21; Montoya, 2/18/10, 11:8-13:24, 41:1-43:16; Fuentes, 2/18/10, 84:3-85:13.

[15] Baez, 2/16/10, 64:15-66:25; Resendiz, 147:12-150:9; Matias, 2/17/10, 8:19-13:2; Juarez Benitez, 2/17/10, 56:8- 58:18; Rios, 2/17/10, 79:9-81:22; Alvarez, 2/17/10, 120:6-122:21; Montoya, 2/18/10, 11:8-13:24; Rangel, 2/18/10, 76:24-77:4; Fuentes, 2/18/10, 84:3-86:25.

[16] Exs. 2, 6, 17, 20, 24, 26, 35, 36, 37.

all the bills.[17]  Mr. Nguyen also helped Ms. Le falsify records.  He prepared employees' second set of false timecards and asked employees to sign them.[18]  In addition to the timeclock on the wall of the shop, Mr. Nguyen kept a second timeclock in his office that he used to create fraudulent timecards.[19]  He also explained the check and cash payment system to employees and distributed cash pay.[20]

Ms. Le and Mr. Nguyen did not hide their reasons for doctoring timecards from the employees.  On various occasions, they admitted to the employees that they were altering the timecards to fool the Department of Labor and avoid paying taxes.[21]  Not surprisingly, Ms. Le used fear and bribes to prevent her employees from reporting Best Miracle to the authorities.  She would insult or scream at employees when she became angry.[22]  On one occasion, Juan Carlos Montoya called in sick to work because of a toothache.  Ms. Le fired him for calling in sick.  When Mr. Montoya asked to be paid for the work he had done in that pay period, Ms. Le took his notebook and threw it at him.  Mr. Nguyen let Mr. Montoya have his job back after Mr. Montoya threatened to call the Department of Labor.[23]  On another occasion, Ms. Le began to suspect that an employee had filed a complaint with the Department of Labor.  In her efforts to discover the identity of the complainant, Ms. Le searched through Lilia Baez's personal belongings and demanded to see her cellphone call log.  She tried bribing Ms. Baez with money.  After informing the employees that she would not give them work if they did not help her, Ms. Le fired Ms. Baez for refusing to expose the complainant.[24]  Worst of all, Ms. Le

---

[17] Nguyen, 2/25/10, 66:12-16, 62:18-24; Fuentes, 2/18/10, 82:17-23.
[18] Resendiz, 2/16/10, 147:12-150:9; Baez, 2/16/10, 106:20-22; Alvarez, 2/17/10, 120:19-22.
[19] Alvarez, 2/17/10, 160:2-162:13; Montoya, 2/18/10, 41:1-43:16.
[20] Resendiz, 2/16/10, 148:8-12.
[21] Baez, 2/16/10, 78:15-79:10; Matias, 2/17/10, 29:4-16; Alvarez, 2/17/10, 121:8-22, 142:22-145:4.
[22] Alvarez, 2/17/10, 128:17-129:3; 142:15-21.
[23] Montoya, 2/18/10, 14:12-15:5.
[24] Baez, 2/16/10, 85:1-86:6.

threatened to report any employees who cooperated with the Department of Labor to the immigration authorities.[25]

In the summer of 2007, the Department of Labor began investigating Best Miracle for suspected wage and hour violations.  Investigator John Leung conducted undercover surveillance on the Best Miracle shop for seven days in July 2007.  He recorded the model, make, color, and license plate number of the vehicles parked at the Best Miracle shop.  He also recorded arrivals by foot and by bicycle.  On weekdays, Mr. Leung observed the shop open with cars in the parking lot and 30 to 40 employees working from 6:00 a.m. to 6:00 p.m.  He also found that the shop was open on the two Saturdays that he conducted surveillance.[26]

Mr. Leung and his colleagues at the Department of Labor conducted an on-site inspection of Best Miracle on July 30, 2007.  They found that the majority of the employees were working off the clock.  Specifically, the inspectors observed 31 employees at their work stations, six in the break room, and 10 outside the shop having lunch.[27]  Although there were 47 employees at the shop, the inspectors found that only 15 timecards were punched in for that day.[28]  Ms. Le did not answer when the inspectors asked her where the remaining timecards were.[29]  Two days later, Mr. Leung informed Best Miracle's clients that the Department of Labor had determined that Best Miracle's garments were produced in violation of the FLSA and that the Department objected to shipment of the garments.[30]  Despite receiving this notice, one of Best Miracle's clients,

---

[25] Baez, 2/16/10, 70:17-75:21.
[26] Leung, 2/19/10 (Vol. I), 81:20-84:2.
[27] Pham, 2/16/10, 18:20-19:18; Leung, 2/19/10 (Vol. I), 85:9-21; Exs. 125-1, 125-2.
[28] Pham, 2/16/10, 22:5-22; Leung, 2/19/10 (Vol. I), 86:17-25; Ex. 125-2.
[29] Pham, 2/16/10, 26:21-27:12.
[30] Leung, 2/19/10 (Vol. II), 15:14-16:6.

Moa Moa, shipped the goods anyway after Ms. Le called and said the garments had been produced legally.[31]  Best Miracle closed down shortly after the on-site inspection.[32]

On September 5, 2008, the Secretary filed this action against Best Miracle, Ms. Le, and Mr. Nguyen, seeking to enjoin them from future violations of the FLSA and from withholding unpaid backwages.  The Court conducted a bench trial from February 16, 2010, to February 25, 2010.[33]  This memorandum sets forth the Court's findings of fact and conclusions of law.

## III.    DEFENDANTS VIOLATED THE FLSA

Congress enacted the FLSA to protect the "minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  The FLSA requires employers to keep accurate records and pay employees a minimum hourly wage and overtime pay.  *Id.* §§ 201-219.  It also prohibits distribution of "hot goods," which are goods produced in violation of the Act.  *Id.* § 215(a)(1).  The Secretary has shown that the Best Miracle employees are covered by the Act and that Defendants violated the recordkeeping, overtime, and hot goods provisions of the FLSA.

### A.    Coverage

The FLSA protects employees who are employed by an enterprise engaged in interstate commerce or the production of goods for interstate commerce.  29 U.S.C. §§ 206(a), 207(a).  Employers of such employees are jointly and severally liable for

---

[31] Chung 2/19/10 (Vol. I), 14:25-15:23; Leung, 2/19/10 (Vol. II), 15:4-19:18.
[32] Le, 2/24/10, 115:13-24.
[33] Defendants had no right to a jury trial under the Seventh Amendment because the Secretary sought only injunctive relief.  *McLaughlin v. Owens Plastering Co.*, 841 F.2d 299, 300 (9th Cir. 1988); *Paradise Valley Investigation & Patrol Servs. v. U. S. Dist. Court*, 521 F.2d 1342, 1343 (9th Cir. 1975).

violations of the FLSA.  *Boucher v. Shaw*, 572 F.3d 1087, 1094 (9th Cir. 2009).  Under the FLSA, an "employer" includes any person "acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).  "Where an individual exercises control over the nature and structure of the employment relationship, or economic control over the relationship, that individual is an employer within the meaning of the Act."  *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999) (internal quotations and citations omitted).  The Ninth Circuit uses a four-factor "economic reality" test to determine whether an individual is an employer for the purposes of the FLSA: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991).

Best Miracle and Ms. Le have admitted that they are employers covered by the FLSA.[34]  In his closing brief, Mr. Nguyen did not dispute that he is an employer.  In any case, Mr. Nguyen is an employer under the FLSA because his actions satisfy three of the four factors of the "economic reality" test.  First, Mr. Nguyen had the authority to hire and fire Best Miracle employees.  Mr. Montoya testified that when Ms. Le fired him for calling in sick to work, Mr. Nguyen let him keep his job.[35]  Second, Mr. Nguyen supervised and controlled employee work schedules.  For example, Mr. Nguyen gave Oscar Fuentes permission to start work at 7:00 a.m. when the other workers started at 6:00 a.m.[36]  Mr. Nguyen also told employees to punch in for less than eight hours per day.[37]  Third, Mr. Nguyen maintained employment records for Best Miracle employees.  He prepared fraudulent timecards and asked employees to sign them.[38]  Mr. Nguyen also

---

[34] Ex. 175, Nos. 7, 8, and 12.
[35] Montoya, 2/18/10, 14:15-15:12.
[36] Fuentes, 2/18/10, 82:17-23.
[37] Matias, 2/17/10, 9:3-12.
[38] Alvarez, 2/17/10, 120:19-22; Resendiz, 2/16/10, 148:2-12.

testified that he filled out the time and wage sheet, signed paychecks, and paid all the bills at Best Miracle.[39]  These factors taken together show that Mr. Nguyen is an employer under the FLSA because he exercised significant economic control over Best Miracle employees.

### B. Overtime

Under Section 7 of the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207.  When an employer fails to maintain accurate payroll records,[40] the Secretary carries her burden under the FLSA if she shows that the employees performed work for which they were improperly compensated and produces some evidence to show the amount and extent of that work "as a matter of just and reasonable inference."  *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972).  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [Secretary's] evidence."  *Mt. Clemens Pottery*, 328 U.S at 687-88.

---

[39] Nguyen, 2/25/10, 66:12-16, 62:18-24.

[40] Section 11(c) of the FLSA requires an employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him . . . ."  29 U.S.C. § 211(c).  Specifically, employers must keep accurate records of 1) the total daily and weekly hours employees work, 2) employees' regular hourly rates of pay for each week that overtime is worked, 3) the total daily or weekly straight time earnings, and 4) the total weekly premium pay for overtime hours.  29 C.F.R. §§ 516.2, 516.5.

The Ninth Circuit had held that this standard "allows district courts to award back wages under the FLSA to non-testifying employees based upon the fairly representative testimony of other employees . . . .  The burden is not on the employees to prove the precise extent of uncompensated work." *Ho Fat Seto*, 850 F.2d at 589.  Courts have allowed all employees to recover backwages on the representative testimony of 18 percent, 11 percent, or even 3.5 percent of employees.  *Id.* at 589-90; *McLaughlin v. DialAmerica Marketing*, 716 F. Supp. 812, 824 (D. N.J. 1989); *Mt. Clemens Pottery*, 328 U.S. at 684.

The Secretary has established that Defendants' records are inaccurate and has presented ample evidence of the amount of uncompensated work employees performed.  Nine former Best Miracle employees testified that the timecards and payroll records were inaccurate and did not reflect all the hours they worked.  These employees testified that their Monday through Friday schedule was 6:00 a.m. to 6:00 p.m.  They also testified that they worked on most Saturdays, from 6:00 a.m. to 2:00 p.m. on average, and on some Sunday mornings.[41]  The Secretary's employee witnesses testified that they saw other Best Miracle employees working similar overtime hours.[42]  For example, David Resendiz testified that his wife worked at Best Miracle and carpooled to and from work with him.[43]  Pablo Alvarez testified that his sister, Claudia Alvarez, worked the same hours that he worked at Best Miracle.[44]

The Best Miracle timecards and payroll records do not reflect the hours that the employees testified they worked.[45]  All of the employees testified that they used

---

[41] *See supra* note 8.

[42] Baez, 2/16/10, 80:18-83:10; Resendiz, 2/16/10, 152:13-153:9; Juarez Benitez, 2/17/10, 76:10-14. Alvarez, 2/17/10, 124:18-125:15; Montoya, 2/18/10, 73:5-15; Fuentes, 2/18/10, 82:3-16.

[43] Resendiz, 2/16/10, 150:14-23.

[44] Alvarez, 2/17/10, 124:12-17.

[45] Exs. 2, 6, 17, 20, 24, 26, 35, 36, 37.

timecards, regardless of whether they were paid by the hour or by the piece.[46]  Some employees testified that they were instructed not to punch over 40 hours per week on their timecards.[47]  Other employees testified that they kept two sets of timecards: a "real" timecard showing all of their hours and a "fake" timecard showing only 40 hours per week.[48]  Many witnesses testified that they saw Mr. Nguyen using a second timeclock in his office to falsify timecards.[49]  The Secretary's witnesses testified that they were paid by check for the hours on their false timecards, which generally showed less than 40 hours per week, and that they were paid in cash at a straight rate for any additional hours.[50]  Sometimes they received cash for entire weeks.[51]  The employees' paystubs do not reflect the cash pay, nor do Defendants' payroll records.[52]  Additionally, some employees are missing from the payroll records for days, or even weeks, at a time, even though they appear on the timecards for those weeks and claim that they worked during that time.[53]  Four Best Miracle employees, Kim Anh, Rosalia Linares, Alvaro Munoz, and Heidi Orosio, do not appear on payroll records or W-2s at all,[54] even though the Secretary's witnesses identified them as employees.[55]

The Secretary's undercover surveillance corroborates the employees' testimony. Mr. Leung testified that he conducted surveillance for seven days in July 2007, including five weekdays and two Saturdays.  During the weekdays, the shop was already open with

---

[46] *See supra* notes 9 and 10.

[47] *See supra* note 11.

[48] *See supra* notes 12-14.

[49] *See supra* note 19.

[50] *See supra* note 15.

[51] Resendiz, 2/16/10, 149:1-3; Baez, 2/16/10, 64:15-67:10; Montoya, 2/18/10, 26:5-9; Rangel, 2/18/10, 78:25-79:3.

[52] *See supra* note 15; Leung, 2/23/10, 59:23-24, 62:16-21, 64:5-65:1.

[53] Rangel, 2/18/10, 78:22-79:10; Ex. 35-4, 172, 173; Le, 2/25/10, 38:3-22.

[54] Leung, 2/19/10 (Vol. I), 88:4-89:21, 95:19-96:10; 2/19/10 (Vol. II), 4:11-5:9; Exs. 98, 99, 100, 112, 113, 114.

[55] Identifying Anh: Baez, 2/16/10, 83:11-25.  Identifying Linares: Baez, 2/16/10, 84:1-4; Resendiz, 2/16/10, 151:19-22; Montoya, 2/18/10, 17:8-16.  Identifying Orosio: Resendiz, 2/16/10, 151:23-152:3. Identifying Munoz: Resendiz, 2/16/10: 151:9-14; Montoya, 2/18/10, 17:20-24.

many cars in the parking lot and 30 to 40 employees working when he arrived between 6:00 a.m. and 7:00 a.m.  Most vehicles parked at the shop in the morning were still present at 5:00 p.m., 6:00 p.m., or even later.  Mr. Leung also observed many employees arriving at 6:00 a.m. and leaving at 6:00 p.m. by foot or by bicycle.  Mr. Leung confirmed that the shop was open on Saturdays as well.[56]

After comparing Mr. Leung's investigation notes to car registration information from the Department of Motor Vehicles and the records provided by Defendants, the Secretary identified 58 instances over seven days where cars registered to employees were parked at the shop at times when the owners of the cars were not punched in on their timecards.[57]  For example, on July 3, 2007, Leticia Damanson's car was at the shop at 6:10 a.m., but her timecard shows her as having punched in at 9:15 a.m. that day.[58]  On July 17, 2007, Jesus Colin's car was parked at the shop at 5:45 p.m., but his timecard shows him as having punched out at 12:58 p.m. that day.[59]  These 58 discrepancies include 17 instances in which an employee's car was parked at the shop when the employee did not have any timecard entries for that day and five instances in which the employee did not appear on that week's payroll at all.  For example, Ms. Baez's car was at the shop from at least 7:00 a.m. to 5:45 p.m. or later on July 17, 2007, yet there is no timecard entry for her on that day.[60]  Similarly, on July 3, 2007, Mr. Resendiz's car was parked at the shop at 6:10 a.m., but there is no timecard for him that day, nor is he on the payroll for that week.[61]

The Secretary's on-site inspection also corroborates the testimony of the employee witnesses.  On July 30, 2007, the Department of Labor inspectors observed 31 employees

---

[56] Ex. 122; Leung, 2/19/10 (Vol. I), 62:3-76:22.
[57] Exs. 121-124; Leung, 2/19/10 (Vol. I), 80:19-24; Basulto, 2/16/10, 43:14-46:20.
[58] Ex. 121-1, line 9; Basulto, 2/16/10, 43:14-46:20.
[59] Ex. 121-4, line 30; Basulto, 2/16/10, 43:14-46:20.
[60] Ex. 121-4, line 29; Basulto, 2/16/10, 43:14-46:20.
[61] Ex. 121-1, line 10; Basulto, 2/16/10, 43:14-46:20.

at their work stations, six employees in the lunch room, and 10 employees outside the shop.[62]  Despite there being 47 employees at the shop, the inspectors found only 15 punched-in timecards for that day.[63]  Ms. Le did not explain where the remaining 32 timecards were.[64]  Tellingly, Defendants never produced the timecards for that workweek.[65]  During the on-site inspection, the inspectors also identified Kim Anh, Rosalia Linares, Alvaro Munoz, and Heidi Orosio,[66] thus corroborating the employee witnesses' testimony that those four individuals were indeed employees of Best Miracle.

The Secretary has met her burden of showing as a matter of just and reasonable inference that the Best Miracle employees, on average, worked from 6:00 a.m. to 6:00 p.m. on weekdays, worked from 6:00 a.m. to 2:00 p.m. on most Saturdays, and occasionally worked on Sunday mornings.  Nine out of 47 employees, or 19 percent of employees, testified to this general schedule, which is greater than the percentage of employees that testified in *Ho Fat Seto*.  The burden then shifts to Defendants "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [Secretary's] evidence."  *Mt. Clemens Pottery*, 328 U.S. at 687.  Defendants failed to do so.

Defendants argued at trial that their records are accurate and that they paid Best Miracle employees all of their overtime.  They accused the Secretary's employee witnesses of lying and attempted to show that Mr. Leung had improperly investigated the case without first receiving authorization from the Department of Labor.  They also accused Mr. Leung of extortion for requesting that Best Miracle pay the backwages.  Defendants' story was not believable or supported by any credible evidence.

---

[62] Pham, 2/16/10, 18:20-19:18; Leung, 2/19/10 (Vol. I), 85:9-21; Ex. 125-1.
[63] Pham, 2/16/10, 22:5-22; Leung, 2/19/10 (Vol. I), 86:17-25; Ex. 125-2.
[64] Pham, 2/16/10, 26:21-27:12.
[65] Leung, 2/19/10 (Vol. II), 5:11-6:13.
[66] Ex. 125-1.

Defendants presented seven former employees who testified that they did not work unpaid overtime.  Two of these employees, Lilia Avila and Antonia Gonzalez Mendoza, are not included in the group of 47 employees for whom the Secretary seeks backwages.[67] Ms. Avila and Ms. Gonzalez Mendoza testified that although they did not work overtime, they did not know the schedules of other employees.[68]  Furthermore, their testimony conflicted with Defendants' payroll records.  Ms. Avila testified that the longest time she took off from work was one week and that she never took off two or three weeks at a time.[69]  She does not appear on Defendants' payroll for 18 weeks in 2006 and 2007, however, including twice for two weeks at a time and twice for three weeks at a time.[70] Ms. Gonzalez Mendoza testified that she worked every week other than a six-month vacation in 2006 and one other week-long vacation.[71]  Ms. Gonzalez Mendoza is missing from the payroll register for 14 weeks beyond the six-month vacation in 2006.[72]

Two other employees that testified that they did not work overtime, Maria Carmen Diaz and Maria Rodriguez, are friends and business associates with Ms. Le and recently went to dinner with her.[73]  Ms. Diaz and Ms. Rodriguez's testimony also conflicts with Defendants' records.  Ms. Rodriguez testified that she did not take any entire workweeks off during her five- to six-month employment with Best Miracle and that she worked at least one day in every week.[74]  She does not appear on the payroll for three whole weeks, however.[75]  Similarly, Ms. Diaz testified that she did not take any weeks off during the six to seven months she worked at Best Miracle, but she is missing from the payroll for

---

[67] Ex. 107.
[68] Avila, 2/24/10, 38:2-9; Gonzalez Mendoza, 2/24/10, 55:25-56:5.
[69] Avila, 2/24/10, 45:12-20.
[70] Exs. 99, 100.
[71] Gonzalez Mendoza, 2/24/20, 63:18-64:8.
[72] Exs. 98-100.
[73] Diaz, 2/23/10, 160:3-162:7.
[74] Rodriguez, 2/23/20, 147:11-22.
[75] Exs. 88-2, 88-3.

five weeks.[76]  This inconsistency between the witnesses' testimony and the other

evidence in this case casts serious doubt on their credibility or knowledge of true facts.

Defendants' last three employee witnesses, Orlando Sanchez, Son Dau, and Jaime

De La Rosa, were unofficial supervisors who trained the other employees about the

timekeeping system or distributed work.[77]  Mr. Sanchez testified that he typically worked

from 7:00 a.m. to 3:30 p.m. or 4:30 p.m.[78]  There were a number of problems with Mr.

Sanchez's testimony.  On cross examination, Mr. Sanchez first stated that he was not sure

if he had worked for a shop called Double T before Best Miracle and that he did not

know if Ms. Le was affiliated with any of his prior employers.[79]  Upon further

questioning, Mr. Sanchez admitted that he had worked for Double T and that Ms. Le

would distribute work at Double T.[80]  Although Mr. Sanchez denied having supervisory

duties at Best Miracle, the Secretary's employee witnesses, as well as Defendants' own

witnesses, testified that Mr. Sanchez acted as a supervisor at Best Miracle.[81]  Mr. Sanchez

also met with Ms. Le for dinner a few months before trial and inquired about whether she

would have any work for him in the future.  Mr. Sanchez admitted that he is unemployed

and is seeking work from Ms. Le.[82]

Mr. Dau testified that he worked from around 8:00 a.m. or 9:00 a.m. to 3:00 p.m.

or 4:00 p.m.[83]  Mr. Dau's car, however, was often parked outside of the Best Miracle

shop at times when he was not punched in on his timecard.  On July 9, 2007, Mr. Dau's

---

[76] Diaz, 2/23/10, 157:12-20; Exs. 63-2, 63-3.
[77] Baez, 2/16/10, 77:20-78:3; Alvarez, 2/17/10, 120:23-121:18; Montoya, 2/18/10, 41:1-18; 72:3-17;
Gonzalez Mendoza, 2/24/10, 58:12-17.
[78] Sanchez, 2/23/10, 165:11-24.
[79] Sanchez, 2/23/10, 169:11-22.
[80] Sanchez, 2/23/10, 170:12-25.
[81] Alvarez, 2/17/10, 120:23-121:18, 133:12-14, 136:15-16, 142:2-21, 144:1-6, 146:3-9; Gonzalez
Mendoza, 2/24/10, 57:12-17.
[82] Sanchez, 2/23/10, 177:1-7.
[83] Dau, 2/25/10, 52:2-7.

car was at the shop at 6:00 a.m., but he had not punched in until 9:10 a.m.  On July, 25, 2007, Mr. Dau's car was at the shop when Mr. Leung arrived at 9:00 a.m. and stayed there until 6:00 p.m., but there is no timecard for him that day, nor is he on payroll for that day.[84]  Mr. Dau testified that on rare occasions he left his car at the shop when it broke down.[85]  This seems an unlikely explanation for the surveillance discrepancies given that Mr. Leung observed Mr. Dau's car at the shop when Mr. Dau was not punched in on two out of seven days he performed surveillance.  It also fails to explain why Mr. Leung saw Mr. Dau's car leaving the shop at 6:00 p.m. with all the other employees' cars on a day when Mr. Dau was not punched in or on payroll.

And Mr. De La Rosa's testimony was the most unbelievable.  Mr. De La Rosa testified that the shop opened at 7:00 a.m. and closed at 3:30 p.m. on weekdays.[86]  His testimony contradicts his own timecards, which he insisted are accurate.[87]  It also conflicts with Defendants' admission that the shop was open from 6:00 a.m. to 6:00 p.m. on weekdays.[88]  Furthermore, Mr. Leung's surveillance showed that Mr. De La Rosa worked from 6:00 a.m. to 6:00 p.m. on weekdays.  Mr. De La Rosa's car was at the shop at 6:10 a.m. on July 3, 2007, but his timecard shows that he punched in at 9:30 a.m.[89]  On July 5 and July 17, 2007, Mr. De La Rosa's car was at the shop, but he did not punch in at all on those days.[90]  On July 25, 2007, Mr. De La Rosa's vehicle left at 6:00 p.m., but his timecard shows that he punched out at 2:01 p.m.[91]  Mr. De La Rosa also testified that he would never take off whole weeks from work,[92] but he is missing from the payroll for

---

[84] Ex. 121; Basulto, 2/16/10, 43:14-46:20.
[85] Dau, 2/25/10, 52:8-53:7.
[86] De La Rosa, 2/24/10, 11:24-12:19.
[87] De La Rosa, 2/24/10, 9:15-16; Ex. 13.
[88] Le, 2/24/10, 89:3-19; Ex. 175. No. 11.
[89] Ex. 121-1, line 2; Basulto, 2/16/10, 43:14-46:20.
[90] Ex. 121-2, line 14; Ex. 121-4, line 32; Basulto, 2/16/10, 43:14-46:20.
[91] Ex. 121-4, line 37; Basulto, 2/16/10, 43:14-46:20.
[92] De La Rosa, 2/24/10, 25:14-26:18.

eight entire weeks.[93]  Additionally, Mr. De La Rosa claimed that he did not remember
Ms. Le's name when asked who his manager was at Double T even though Ms. Le had
been his boss at Best Miracle for years.  He claimed to remember that she was his
supervisor at Double T only upon further questioning.[94]  Most egregiously, Mr. De La
Rosa testified that he had never met with Defendants' attorneys, who were sitting in the
courtroom at the defense counsel table during his testimony.  When asked if he had met
Defendants' attorneys on direct examination, Mr. De La Rosa said no.[95]  When asked
again on cross examination, Mr. De La Rosa looked over at Defendants' counsel and
again stated that he had not met with any of them.[96]  He only "remembered" meeting
them after being confronted with a transcript of his deposition taken at their office a few
months earlier.[97]  Tellingly, Mr. De La Rosa testified that he is angry at the Department
of Labor and the employee who reported Best Miracle because they are responsible for
the shop closing and putting him out of work.[98]

Ms. Le's testimony was similarly full of inconsistent, misleading, and false
statements.  Ms. Le testified that although the shop was open from 6:00 a.m. to 6:00 p.m.,
Monday through Friday, and from 6:00 a.m. to 12:00 p.m. or later on Saturdays, the
employees worked in shifts.[99]  She seemed intent on obscuring her history of owning and
operating garment shops.  Ms. Le testified that she worked as a production manager for a
company called CMD Management, which she claimed was a garment manufacturer.[100]
She denied hiring CMD as a payroll servicer for her garment shops.[101]  In contrast,
CMD's Chief Executive Officer testified that CMD is a payroll processing and workers'

---

[93] Ex. 61.
[94] De La Rosa, 2/24/10, 24:5-22.
[95] De La Rosa, 2/24/10, 16:14-15.
[96] De La Rosa, 2/24/10, 26:19-27:5.
[97] De La Rosa, 2/24/10, 26:19-29:20, 34:7-35:3.
[98] De La Rosa, 2/24/10, 31:20-32:25.
[99] Le, 2/24/10, 89:3-92:14.
[100] Le, 2/24/10, 67:18-69:1.
[101] Le, 2/25/10, 11:3-8.

compensation insurance service provider.  He said Ms. Le and Mr. Nguyen were CMD's customers from 2000 to 2005 and were never CMD employees.[102]  He also testified that he knew Ms. Le and Mr. Nguyen owned garment shops because he delivered the payroll to their shops and received checks from them to cover payroll, workers' compensation insurance, employers' taxes, and CMD's fee.[103]

Ms. Le also testified inconsistently about her experience with Double T and another garment shop called G Services.  During her deposition, Ms. Le denied any involvement whatsoever with Double T, saying that she knew nothing about Double T, was never paid by Double T, and never gave any advice to her sister about operating Double T.[104]  At trial, however, Ms. Le testified that she worked for Double T and that she trained her sister about production, dealing with employees, and interacting with customers.[105]  Similarly, Ms. Le stated in her deposition that she could not recall whether she had ever heard the name "G Services" or if she was ever affiliated at any time with G Services.[106]  At trial, Ms. Le admitted that G Services was a garment company that she owned and operated.[107]

Mr. Nguyen was also not a credible witness.  He testified that he was a trimmer at CMD and that he did not know that CMD was a payroll service company.  He denied that Defendants hired CMD to provide payroll services for the various shops they operated.[108]  As discussed above, this testimony flatly contradicted the testimony of CMD's CEO, who

---

[102] Shen, 2/25/10, 70:10-73:9.
[103] Shen, 2/25/10, 77:3-10.
[104] Le, 2/25/10, 26:1- 30:19.  In an apparent attempt to prevent the Department of Labor from obtaining the payroll records of Double T, Defendants, with Ms. Le's knowledge, filed a motion to quash the subpoena served on Double T's accountant and attached Ms. Le's deposition testimony.  Le, 2/25/10, 31:18-34:17.
[105] Le, 2/24/10, 73:16-75:11.
[106] Le, 2/24/10, 30:24-31:6.
[107] Le, 2/24/10, 70:23-71:14.
[108] Nguyen, 2/25/10, 66:17-67:3.

stated that CMD was a payroll processing company hired by Defendants.  Mr. Nguyen also testified in his deposition that he merely knew of G Services but did not remember any information about the company.  At trial he admitted that he was its CEO and President when confronted with a state stock certificate. [109]

Defendants also argue that Mr. Leung's surveillance fails to support the Secretary's version of events.  They implied at trial that Mr. Leung is corrupt because he conducted his surveillance before the Department of Labor computer files show that he was "assigned" the Best Miracle case on July 18, 2007.  As Mr. Leung explained, however, a case file is only "assigned" on the computer after initial surveillance shows that the Department of Labor should initiate a formal investigation.[110]  Indeed, Mr. Leung's supervisor at the Department of Labor testified that he instructed Mr. Leung to conduct surveillance on Best Miracle before July 18, 2007.[111]  Defendants also argue that Mr. Leung's surveillance of the parking lot fails to show that Best Miracle employees were working overtime because Mr. Leung observed people arriving after 6:00 a.m. and leaving before 6:00 p.m.  While not all cars and pedestrians arrived exactly at 6:00 a.m. and left exactly at 6:00 p.m., the vast majority of employees arrived and left within a half hour of those times.[112]  Furthermore, Defendants argue that there are a number of reasons why employees' cars might be at the shop while they are not working, for example, because they are eating breakfast, waiting for work, or working for another company. Defendants, however, failed to present sufficient evidence of these reasons to explain the

---

[109] Nguyen, 2/25/10, 63:4-65:10.
[110] Leung, 2/19/10 (Vol. I), 88:8-97:13.
[111] Huerta, 2/23/10, 87:16-89:16.
[112] Ex. 122; Leung, 2/23/10, 33:24-43:4.  Defendants also argue that Mr. Leung cannot establish the work hours of any employees because he did not identify all of the vehicles in the area and could not personally identify any employees.  This argument is nonsense.  Of course the surveillance does not, by itself, establish that each and every one of Defendants' employees worked over 60 hours per week. Mr. Leung's surveillance, in combination with the DMV records of the employees and Defendants' records, provides compelling evidence that Defendants' records were inaccurate and that Best Miracle employees generally worked from 6:00 a.m. to 6:00 p.m. on weekdays.

many timecard discrepancies the Secretary identified in the surveillance report.[113]  The Secretary's employee witnesses testified that they did not park their cars at the Best Miracle shop when they were not working,[114] and common sense supports that conclusion.

In sum, the testimony of Defendants' witnesses was a web of implausible and internally inconsistent lies.  Some witnesses testified that the shop closed at 3:30 p.m. every day, while other witnesses testified that the shop was open until 6:00 p.m. but the employees worked in shifts.  Employees who acted as supervisors tried to conceal that role.  Employees who had worked for Ms. Le for years testified that they could not remember that she had supervised them at Double T.  One employee even said he had never met with Defendants' attorneys despite having his deposition taken by them at their office a few months prior.  Ms. Le and Mr. Nguyen gave testimony about their roles at Double T and G Services that contradicted their deposition testimony.

Most of Defendants' employee witnesses had an obvious motive to alter their testimony to support Defendants.  Some of the witnesses were friends with Ms. Le.  Others were supervisors at Best Miracle.  One witness was openly angry about the shop closing.  Significantly, some witnesses were hoping to work for Ms. Le in the future.  The only two witnesses without apparent biases, Ms. Avila and Ms. Gonzalez Mendoza, seemed to know very little about Best Miracle's operations and are not part of the group of 47 employees for whom the Secretary seeks backwages.

---

[113] In any case, the two witnesses who testified that, on rare occasions, they waited for work at Best Miracle or worked for Moa Moa while leaving their cars at Best Miracle stated that they carried out those actions at Defendants' request.  Baez, 2/16/10, 69:6-7; Matias, 2/17/10, 45:20-51:25.

[114] Baez, 2/16/10, 68:25-69:17; Resendiz, 2/16/10, 176:12-14; Rios, 2/17/10, 81:23-82:5; Fuentes, 2/18/10, 87:17-22.

To be sure, the Secretary's witnesses had a monetary incentive to testify that they worked unpaid overtime.  By testifying on behalf of the Secretary, however, these employees likely shut themselves out of future employment with Ms. Le and Mr. Nguyen.  Testifying was also risky for these employees, many of whom may be undocumented immigrants and may have tax liability based on the cash wages they received.  Most of all, the testimony of the Secretary's witnesses was credible because it was consistent and logical.  Defendants argue that the Secretary's witnesses testified inconsistently about the ways in which they were paid and the ways in which Defendants falsified timecards.  In fact, all of the Secretary's employee witnesses testified that Defendants paid them by check for 40 hours per week and in cash at a straight rate for overtime hours.  While Defendants used various methods to falsify timecards, each method produced timecards showing no more than 40 hours per week.  Thus, the more logical explanation based on the evidence is that Defendants, relying on their past experience with the Department of Labor, devised a number of ways to falsify timecards in order to evade enforcement.  There is simply insufficient evidence to suggest that the Secretary's employee witnesses and the Department of Labor conspired to wage a widespread defamatory campaign against Best Miracle.  Defendants have failed to rebut the Secretary's prima facie case that Defendants kept inaccurate records and did not pay their employees overtime.  The Court therefore finds that Defendants violated Section 7 of the FLSA.[115]

---

[115]  The Secretary argues that there is a minimum wage violation only if the Court accepts Defendants' argument that they never paid employees in cash.  Defendants testified that they did not make any cash payments to employees, but the Secretary's employee witnesses consistently testified that they were paid in cash at a straight rate for overtime hours.  For the reasons stated above, the Court finds the Secretary's employee witnesses credible.  Additionally, the employees would have little incentive to lie about cash pay because it would only reduce the amount of backwages they would receive.  Based on the evidence in this case, Defendants paid Best Miracle employees at least minimum wage for all hours worked, so there is no violation of the minimum wage provisions of the FLSA.

## C.    Hot Goods

The hot goods provision of Section 15 of the FLSA states that it is unlawful for any person "to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of [the minimum wage or overtime provisions of the FLSA]."  29 U.S.C. § 215(a)(1).  The hot goods provision of the FLSA "reflects Congress' desire to eliminate the competitive advantage enjoyed by goods produced under substandard conditions."  *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 36 (1987).  The Supreme Court has held that "exclusion from interstate commerce of goods produced under substandard conditions is not simply a means to enforce other statutory goals; it is itself a central purpose of the FLSA."  *Id.* at 36 n.8

The parties have stipulated that Best Miracle produced goods for Moa Moa and Byer California during the entire time it operated.[116]  Moa Moa and Byer California shipped these goods in interstate commerce.[117]  Defendants argue that they did not violate the hot goods provisions of the FLSA because the goods were not "hot."  As described above, the Court finds that the garments produced by Best Miracle during the entirety of its existence were produced in violation of the FLSA because Defendants did not pay their employees overtime.  Defendants therefore violated Section 15 of the FLSA by selling hot goods to Moa Moa and Byer California, knowing that they would be sold in interstate commerce.

---

[116] Ex. 175, Nos. 13, 14.
[117] Chung, 2/19/10 (Vol. I), 37:21-24.

### D.    Willful Violations

Although the statute of limitations is normally two years for cases brought under the FLSA, a three-year statute of limitations applies to employers whose violations are willful.  29 U.S.C § 255(a).  A violation is considered "willful" if the employer knew or showed reckless disregard as to whether its conduct violated the Act.  *McLaughlin v. Richland Shoe*, 486 U.S. 128, 133 (1988).

Defendants' violations were willful.  Defendants have admitted knowledge of the FLSA recordkeeping and overtime requirements, and Ms. Le admitted that she had violated the FLSA while working at Double T.[118]  It is also clear that Defendants' actions were willful because they engaged in a deliberate campaign to falsify records at Best Miracle that included instructing employees to punch in for fewer hours than they actually worked and preparing fraudulent timecards.[119]  They even told their employees on multiple occasions that the fraudulent timecards were designed to mislead the Department of Labor.[120]  The Secretary has shown that Defendants acted willfully, so a three-year statute of limitations applies.  Defendants are liable for violations they committed within three years of the Secretary's filing of the complaint on September 5, 2008.  This period includes all but four of the paydays during Best Miracle's existence.[121]

### E.    Injunctive Relief

The Secretary seeks a permanent injunction prohibiting Defendants from further violating the FLSA's recordkeeping, overtime, and hot goods provisions.  Although Best Miracle is not currently operating, the Secretary has shown that an injunction is necessary

---

[118] Ex. 175, Nos. 15, 16; Le, 2/24/10, 83:24-85:7; Ex. 158; Leung, 2/19/10 (Vol. II), 28:17-34:3.
[119] *See supra* notes 9-20, 45.
[120] *See supra* note 21.
[121] Ex. 104.

to shift the burden of enforcement should Defendants re-open Best Miracle. Furthermore, an injunction against Ms. Le and Mr. Nguyen is necessary given their long history of opening various garment shops under different names.

The Secretary also seeks an injunction to prohibit Defendants from continuing to withhold unpaid overtime compensation.  Although the exact amount of backwages being withheld is impossible to determine, Defendants may not complain that the computations "lack the exactness and precision of measurement that would be possible had [they] kept records in accordance with the requirements of § 11(c) of the Act."  *Mt. Clemens Pottery*, 328 U.S. at 687-88.  The Secretary estimates that Best Miracle employees worked 60 hours per week on average and that Defendants owe 47 employees backwages for unpaid overtime in the total amount of $172,832.50.[122]  The Secretary calculated this amount by multiplying the weeks each employee worked by 20 overtime hours per week to estimate the total amount of overtime hours worked by each employee at Best Miracle.  To account for holidays, slow periods, and other absences, the Secretary reduced the number of workweeks by 15 percent for employees who worked more than a year and by 50 percent for employees for whom the Department of Labor did not have accurate information.  The Secretary then multiplied the total overtime hours by one-half the hourly wage of the employee.[123]  The Court finds her estimate credible and reliable.[124]  If

---

[122] Ex. 107.

[123] Huerta, 2/23/10, 93:22-94:24, 97:8-98:3.

[124] Based on the testimony of the witnesses, the Secretary credited the employees with a $200 weekly cash payment, for a total weekly pay of $450, or $7.50 an hour.  Defendants argue that the Secretary's calculations are inaccurate because she inadvertently failed to apply the $200 cash credit to some employees.  Out of 47 employees, the Secretary listed eight as earning $400 or less a week and three as earning $500 a week.  An employee earning $400 for 60 hours per week would be making $6.67 per hour—less than the California minimum wage during 2005-2007.  The Secretary therefore used the California minimum wage—$6.75 before 2007 and $7.50 an hour starting in 2007—to calculate the hourly wage for those employees.  Because this rate was equal to or less than the $7.50 an hour credited to all other employees, the error actually favors Defendants.  The Secretary also used a weekly pay of $500 for Juan Montoya, Jorge Luis Rios, and Manuel Matias.  This was not part of the cash payment error, as these three witnesses testified that they received more than $450 a week on average.  *See supra* note 15.

anything, the estimate is conservative because the employees likely worked more than 60 hours per week and because the Secretary applied generous reductions in the estimated number of workweeks.

The Secretary also requests prejudgment interest.  "[I]t is ordinarily an abuse of discretion not to include pre-judgment interest in back-pay awards under the FLSA." *Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir. 1986).  The default prejudgment interest rate is calculated pursuant to 28 U.S.C. § 1961, "unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate."  *Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir. 1984).  The Secretary has not presented evidence that the equities of this case require a different rate, so the Secretary shall recover prejudgment interest in the amount specified by 28 U.S.C. § 1961, starting from the last payday of August 17, 2007.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that Defendants violated the recordkeeping, overtime, and hot goods provisions of the FLSA.  The Secretary is directed to file a proposed permanent injunction and a proposed judgment consistent with this Order by May 17, 2010.

DATED:     May 3, 2010

CORMAC J. CARNEY